**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>RETIREMENT VALUE LLC,<br><br>Defendant.<br><br>RETIREMENT VALUE LLC,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>Counterclaim-Defendant. | Civil Action No. 21-20438 (MAS) (LHG)<br><br>**MEMORANDUM OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on Plaintiff/Counterclaim-Defendant Lincoln National Life Insurance Company's ("Lincoln National") Motions to Strike Affirmative Defenses and to Dismiss Counterclaims of Defendant/Counterclaim-Plaintiff Retirement Value LLC ("Retirement Value"). (ECF No. 35.) Retirement Value opposed (ECF No. 47), and Lincoln National replied (ECF No. 50). The Court has carefully considered the parties' submissions and decides the matter without oral argument under Local Civil Rule 78.1. For the reasons below, the Court grants in part

and denies in part the Motion to Strike Affirmative Defenses and grants the Motion to Dismiss Counterclaims.

## I. BACKGROUND

On or about May 25, 2007, Jefferson Pilot Life Insurance Company (a predecessor entity of Lincoln National) issued two life insurance policies (policy numbers JP5581248 and JP5575311) (the "Policies") to the Haya Majerovic Family Trust (the "Trust") as both the owner and beneficiary of the Policies. (Compl. ¶ 20, ECF No. 1.) The Policies insured the life of Haya Majerovic and provided a combined eight-million-dollar death benefit. (*Id.*) Following a series of transfers, Retirement Value became the record owner and beneficiary of the Policies on July 27, 2010. (*Id.* ¶¶ 27-29.)

The Policies were solicited and negotiated in New York. (Def.'s Opp'n Br. 4, ECF No. 47.) Haya Majerovic lived in New York during the application process, and she completed the required medical exam in New York. (Pl.'s Moving Br. 9, ECF No. 35-1; Def.'s Opp'n Br. 4.) The insurance agent was licensed in New York and maintained an office there. (Pl.'s Moving Br. 9; Def.'s Opp'n Br. 4.) The application for the Policies was ultimately signed in Lakewood, New Jersey. (Pl.'s Moving Br. 7; Compl. ¶¶ 13, 17.) The Policies were issued to the Trust, which is domiciled in New Jersey, as the sole owner and beneficiary. (Def.'s Opp'n Br. 3-4; Pl.'s Moving Br. 8; Compl. ¶¶ 12, 20.) The Policies were ultimately issued to the Trust via an address in Lakewood, New Jersey. (Pl.'s Moving Br. 7-8; Compl. ¶¶ 12, 22.) Two of the Trust's trustees resided in New York at this time. (Def.'s Opp'n Br. 4.)

Shortly before the Policies were transferred to Retirement Value, a Texas court placed Retirement Value, a Texas limited liability company, into receivership ("Receivership Proceedings"). (Def.'s Opp'n Br. 7.) The court appointed Eduardo S. Espinosa as receiver (the "Receiver") to protect Retirement Value's money, property, and assets for the benefit of

Retirement Value's victims.[1] (*Id.*) The Receiver quickly determined that Retirement Value's life insurance policies were its most lucrative assets, and in order to recover as much money as possible for the victims, further determined that it would be most beneficial to retain some of the life insurance policies owned by Retirement Value, continue to pay the premiums on the policies, and collect the death benefits for the victims when the policies matured. (*Id.*; Am. Countercls. ¶¶ 20, 23, ECF No. 31.) This decision was made, in material part, based on information provided by the life insurance companies—including the information Lincoln National provided about the Policies. (Def.'s Opp'n Br. 7-8.)

The Texas court governing the Receivership Proceedings, accordingly, issued a series of orders instructing all insurance companies that issued any life insurance policies with a beneficial interest held by Retirement Value to cooperate with the Receiver and provide specific information regarding the policies. (*Id.* at 8.) This information included: identification of the policies, their cash and surrender value, any policies in danger of lapse for nonpayment of premiums, and any amounts necessary to maintain and/or rehabilitate such policies. (*Id.*; Am. Countercls. ¶ 25.) Lincoln National provided responses to the Texas court's orders. (Def.'s Opp'n Br. 9.) Based on the information provided by Lincoln National, the Receiver reasonably and justifiably decided to retain the Policies and to continue paying premiums. (*Id.* at 7-8; Am. Countercls. ¶¶ 33-35.)

Before the Receivership Proceedings, the Texas Department of Insurance ("TDI") was investigating Retirement Value and requested information from Lincoln National. (Def.'s Opp'n Br. 9.) Retirement Value alleges that, as a part of its response to this request, Lincoln National determined that the Policies were stranger-originated life insurance ("STOLI") policies and that they, accordingly, had no value. (*Id.* at 9-10; Am. Countercls. ¶¶ 5-6.) Retirement Value alleges

---

[1] *Texas v. Retirement Value, LLC*, No. D-1-GV-10-000454 (126th Dist. Ct., Travis County, Tex., 2010).

that, despite having the STOLI "red flags," Lincoln National did not disclose to Retirement Value that it considered the Policies to be unenforceable and without value, in violation of the Texas court's orders. (Def.'s Opp'n Br. at 10; Am. Countercls. ¶¶ 6-8, 29.) Retirement Value maintains that these orders required Lincoln National to disclose that the Policies had no value of any kind because of Lincoln National's belief that they were STOLI policies and presumably void. (Def.'s Opp'n Br. 8.)

Haya Majerovic died "in or around 2019," and Retirement Value submitted a timely claim for payment of the death benefits under the Policies. (First Am. Answer ¶ 63, ECF No. 31.) Rather than respond to the claim, however, Lincoln National filed this declaratory judgment action on December 9, 2021, seeking a declaration (1) that the two life insurance policies are void *ab initio*, and (2) because they are void *ab initio*, the Court will leave the parties as it finds them and permit Lincoln National to retain the premiums paid on the policies. (*Id.*; Compl. 9-10.) Retirement Value answered, asserting eleven affirmative defenses and filing seven counterclaims.[2] Lincoln National now moves to strike nine of the affirmative defenses and dismiss four of the counterclaims.

## II.     LEGAL STANDARD

### A.     Motion to Strike

Federal Rule of Civil Procedure 12(f) permits a court to strike from a pleading "an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).[3] "An affirmative defense is legally insufficient [if] it is not recognized as a defense to the

---

[2] The eleven affirmative defenses are: (1) lack of personal jurisdiction; (2) statute of limitations; (3) waiver; (4) ratification; (5) laches; (6) unclean hands; (7) *in pari delicto*; (8) unjust enrichment; (9) incontestability; (10) failure to mitigate damages; and (11) failure to state a claim. (*See generally* First Am. Answer.) The seven counterclaims are: (1) breach of contract; (2) fraud; (3) negligent misrepresentation; (4) bad faith; (5) violations of Texas's Deceptive Trade Practices Act; (6) promissory estoppel; and (7) recoupment of premiums. (*See generally* Am. Countercls.)

[3] Hereafter, all references to "Rule" or "Rules" refer to the Federal Rules of Civil Procedure.

cause of action." *Tonka Corp. v. Rose Art Indus.*, 836 F. Supp. 200, 217 (D.N.J. 1993). The Court should not strike an affirmative defense unless "the insufficiency of the defense is 'clearly apparent.'" *Martin v. Hudson Farm Club, Inc.*, No. 18-2511, 2019 WL 3759539, at *2 (D.N.J. Aug. 9, 2019) (quoting *Cipollone v. Liggett Grp., Inc.*, 789 F.2d 181, 188 (3d Cir. 1986)). Motions to strike cannot be used to "challenge the sufficiency of a defense based on the factual record or to determine disputed questions of law." *Id.*

### B.   Motion to Dismiss

Rule 12(b)(6) governs a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). A district court conducts a three-part analysis when considering this motion. *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). "First, the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" *Id.* (alteration in original) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 675 (2009)). Second, the court must accept as true all of the plaintiff's well-pleaded factual allegations and "construe the complaint in the light most favorable to the plaintiff." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) (internal quotation marks omitted) (quoting *Phillips v. County of Allegheny*, 515 F.3d 224, 233 (3d Cir. 2008)). The court, however, may ignore legal conclusions or factually unsupported assertions that merely state "the-defendant-unlawfully-harmed-me." *Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Finally, the court must determine whether "the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'" *Fowler*, 578 F.3d at 211 (quoting *Iqbal*, 556 U.S. at 679). A facially plausible claim "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 210 (quoting *Iqbal*, 556 U.S. at 678).

### III.   DISCUSSION

The validity of many of Retirement Value's affirmative defenses and counterclaims turns on which state's law applies to the Policies.[4] Lincoln National contends that New Jersey law applies, and Retirement Value urges that New York law applies. The Court will first address which state's law applies to the Policies, and, with this foundation, the Court will then address the Motions to Strike Affirmative Defenses and to Dismiss Counterclaims.

#### A.   New Jersey Law Applies to the Policies.

The Court applies a familiar analysis to determine which state's law applies. Courts sitting in diversity apply the choice of law test of the forum state. *Warriner v. Stanton*, 475 F.3d 497, 499-500 (3d Cir. 2007) (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496 (1941)). New Jersey applies the most significant relationship test, which comprises two questions: whether an actual conflict exists, and, if so, which state has the most significant relationship to the controversy—an inquiry determined by weighing the factors in the applicable section of the Restatement (Second) Conflict of Laws (the "Restatement"). *See Caspersen ex rel. Samuel M.W. Caspersen Dynasty Tr. v. Oring*, 441 F. Supp. 3d 23, 36 (D.N.J. 2020) (quoting, among others, *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008)). If no actual conflict exists or if New Jersey has the most significant relationship to the causes of action here, New Jersey law applies. *See id.*

Here, there is a significant conflict between New Jersey and New York law. Under New Jersey law, Lincoln National can challenge the Policies' validity for a lack of insurable interest as an unlawful human life wager after the incontestability period of the Policies has expired. *See Sun Life Assurance Co. of Can. v. Wells Fargo Bank, N.A., as Sec. Intermediary*, 208 A.3d 839, 851

---

[4] The Policies do not include a choice of law provision. (*See generally* 5311 Policy, ECF No. 35-3; 1248 Policy, ECF No. 35-4.)

6

(N.J. 2019) ("*Bergman*"). In New York, however, Lincoln National may not challenge the Policies on these grounds after the incontestability period has expired. *See AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 137-38 (2d Cir. 2018).

Because there is a conflict, the Court moves to the second inquiry of which state has the most significant relationship to the controversy. The Restatement requires the Court to consider: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile, residence, nationality, place of incorporation and place of business of the parties. Restatement (Second) Conflicts of Law § 188. Additionally, the Court must look to the more general factors set forth in the Restatement § 6: (1) interests of interstate comity; (2) interests of the parties; (3) interests underlying the field of law; (4) interests of judicial administration; and (5) competing interests of the states. *Id.* § 6; *see also Snyder v. Farnam Cos.*, 792 F. Supp. 2d 712, 717 (D.N.J. 2011).

There are several connections between the Policies and New York. Retirement Value alleges that the Policies were solicited and negotiated in New York. (Def.'s Opp'n Br. 3-4.) Haya Majerovic lived in New York during the application process, and she completed the required medical exam in New York. (*Id.* at 4; Pl.'s Moving Br. 9.) The insurance agent was licensed in New York and maintained an office there. (Pl.'s Moving Br. 9; Def.'s Opp'n Br. 4.) Two of the Trust's trustees also resided in New York during the time of the application. (Def.'s Opp'n Br. 4.)

There are also substantial ties to New Jersey. The application for the Policies was ultimately signed in Lakewood, New Jersey. (Pl.'s Moving Br. 7; Compl. ¶¶ 13, 17.) The Policies were issued to the Trust, which is domiciled in New Jersey, as the sole owner and beneficiary. (Def.'s Opp'n Br. 3-4; Pl.'s Moving Br. 8; Compl. ¶¶ 12, 20.) The Policies were issued to the Trust via an address in Lakewood, New Jersey. (Pl.'s Moving Br. 7-8; Compl. ¶¶ 12, 22.)

New York and New Jersey both have strong public policies regarding insurance policies that are allegedly STOLI policies. New Jersey has an interest in having STOLI policies declared as violative of its public policy, and New York has an interest in preserving the incontestability of policies after the contestability period has expired. Both states have enacted an insurance code that regulates life insurance policies that are "delivered or issued for delivery" in their respective states. *See* N.J. Stat. Ann. §§ 17B:17-20; *see* N.Y. Ins. Law §§ 3103, 3203(a)(3).

When considering all these factors, the Court finds that New Jersey law should apply. The most important factor supporting New York is that Haya Majerovic was domiciled in New York.[5] The most important factors supporting New Jersey are that the Trust was domiciled in New Jersey, and the application was signed and delivered in New Jersey. The fact that the trustees lived in New York during the application process is not relevant because neither trustee is a contracting party. *See Sun Life Assurance Co. of Can. v. Wells Fargo Bank, N.A., as Sec. Intermediary*, No. 14-5789, 2016 WL 5746352, at *9 (D.N.J. Sept. 30, 2016). The location of the underwriting of the Policies—or any associated interviews and medical exams—are not necessarily relevant under the Restatement. *See id.* ("[W]here the underwriting of the Policy occurred or where interviews related to the Inspection Report occurred are not necessarily relevant under the Restatement."). The government factors persuade the Court in favor of New Jersey law because the Policies were signed and delivered in New Jersey, so the parties' expectations would be most closely aligned with New Jersey law. *See id.* (on substantially similar facts, "the parties would be justified in expecting New Jersey law to apply because it seems as though most of the connections, and the

---

[5] The Court notes, however, that if the Policies are in fact STOLI policies, as Lincoln National contends, this factor becomes increasingly irrelevant. *Sun Life Assurance Co. of Can. v. Wells Fargo Bank, N.A., as Sec. Intermediary*, No. 14-5789, 2016 WL 5746352, at *9 (D.N.J. Sept. 30, 2016) ("[The insured's] domicile is not as important here as it would be in a typical insurance dispute, because she was merely a vessel to further an investment scheme.")

8

qualitatively most significant connections, relate to New Jersey"). When analyzing all these factors, the Court concludes that New Jersey has the most significant relationship to the Policies.

### B.     Motion to Strike

Lincoln National moves to strike the following affirmative defenses: statute of limitations; waiver; ratification; laches; unclean hands; *in pari delicto*; unjust enrichment; and incontestability. (*See* Pl.'s Moving Br. 12-19.) The Court addresses each below.

####    1.     *Waiver, Laches, Unclean Hands, In Pari Delicto, and Ratification*

The affirmative defenses of waiver, laches, unclean hands, *in pari delicto*, and ratification are all legally insufficient defenses for largely the same reasons, explained below.

Under New Jersey law, waiver "involves the intentional relinquishment of a known right, and thus it must be shown that the party charged with the waiver knew of his or her legal rights and deliberately intended to relinquish them." *Shebar v. Sanyo Bus. Sys. Corp.*, 544 A.2d 377, 384 (N.J. 1988). Waiver "cannot be invoked to enforce an agreement which is void as against public policy." *McCarthy v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 218 A.2d 871, 873 (N.J. Super. Ct. App. Div. 1966).

Laches operates as an affirmative defense that "precludes relief when there is an unexplainable and inexcusable delay in exercising a right, which results in prejudice to another party." *Fox v. Millman*, 45 A.3d 332, 341 (N.J. 2012) (internal quotations omitted). This affirmative defense cannot be invoked for contracts that are void. *Jersey City v. Roosevelt Stadium Marina*, 509 A.2d 808, 816 (N.J. Super. Ct. App. Div. 1986) ("Since the lease extension would be void or *ultra vires* due to failure to comply with the statute, estoppel, waiver and laches are not available as defenses to respondents.").

Unclean hands is an equitable doctrine requiring that a "suitor in equity . . . come into court with clean hands . . . ." *Princeton v. Bd. of Chosen Freeholders*, 777 A.2d 19, 32 (N.J. 2001).

Because equitable doctrines "cannot breathe life" into contracts that are void, this affirmative defense has also been rejected as to contracts that are void *ab initio*. *Columbus Life Ins. Co. v. Wilmington Tr., N.A.*, No. 20-7959, 2021 WL 1712528, at *5 (D.N.J. Apr. 30, 2021) (citations omitted).

The idea that a party is *in pari delicto* suffers the same fate in contracts that are void as a matter of public policy. *See Cone v. Russell*, 21 A. 847, 850 (N.J. Ch. 1891) ("[T]he maxim, *in pari delicto* . . . does not apply to a case like this, resting upon the ground of public policy."); *see also In re HealthSouth Corp. S'holders Litig.*, 845 A.2d 1096, 1108 (Del. Ch. 2003). Similarly, a party cannot ratify a contract that is void *ab initio*. *Sherman v. Paterson*, 82 A. 889, 889 (N.J. 1912) (contracts that are void *ab initio* are "incapable of ratification").

These five affirmative defenses are legally insufficient defenses against contracts that are void *ab initio*. In this case, if the Policies are ultimately determined to be STOLI policies, the affirmative defenses will be legally insufficient. Alternatively, if the Policies are found not to be STOLI policies, Retirement Value will not need to rely on these affirmative defenses, and they will be immaterial. *See id. Columbus Life* explained this in a case with similar claims and affirmative defenses:

> As a result, if the Policy here is ultimately determined to be a STOLI arrangement, the equitable defenses of laches, waiver and estoppel, and unclean hands cannot be asserted to sustain the Policy. In other words, if Columbus proves that Policy is a STOLI contract, then the affirmative defenses will not be available to Wilmington. But if Columbus does not prevail, then the affirmative defenses will be unnecessary.

*Id.* Therefore, regardless of the development of the factual record, these five affirmative defenses will be either legally insufficient or immaterial. The Court, therefore, strikes these from the pleading.

2.  *Statute of Limitations and Contestability Period*

Retirement Value asserts that Lincoln National's claims for relief are "barred, in whole or in part, by the applicable statute(s) of limitation and/or by the contestability period set forth in the Policies." (First Am. Answer 7, 14.) Similar to the above, if the Policies are found to be STOLI policies, then they will be void *ab initio* and no terms—including an incontestability provision—will survive. If the Policies are determined not to be STOLI policies, then the incontestability provision would still be in force. (*See* 5311 Policy at 6; 1248 Policy at 6.) The Court does not find, and Retirement Value does not point to, any statute of limitations provision applicable to Lincoln National's declaratory judgment action. (*See generally* First Am. Answer; Def.'s Opp'n Br.) The Court, accordingly, strikes the statute of limitations affirmative defense from the pleading and retains the contestability period affirmative defense.

3.  *Unjust Enrichment*

Contrary to Lincoln National's contention, unjust enrichment is recognized as an affirmative defense under New Jersey law. *F.D.I.C. v. Modular Homes, Inc.*, 859 F. Supp. 117, 122-23 (D.N.J. 1994) ("New Jersey law recognizes that most of [defendant's] other assertions [including unjust enrichment] are affirmative defenses.") (citing *Spiotta v. Shelter Cove Ests.*, 172 A.2d 715 (1961) (treating unjust enrichment as an affirmative defense)). The Court does not find that this affirmative defense is redundant, immaterial, impertinent, scandalous, or legally insufficient. The Court, accordingly, denies Lincoln National's motion to strike this affirmative defense.

**C.     Motion to Dismiss**

Lincoln National moves to dismiss the following counterclaims: fraud; negligent misrepresentation; violations of the Texas Deceptive Trade Practice Act; and promissory estoppel. (*See* Pl.'s Moving Br. 19-33.) The Court addresses each below.

1.  *Fraud*

In New Jersey, the common law elements of fraud are: (1) a material misrepresentation of presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages. *Gennari v. Weichert Co. Realtors*, 691 A.2d 350, 367 (N.J. 1997).[6] Lincoln National moves to dismiss Retirement Value's fraud claim arguing that Retirement Value (1) did not allege fraud with the requisite particularity required by Rule 9(b), and (2) did not allege an actual misrepresentation. (Pl.'s Moving Br. 20-23.) Because the Court finds that Retirement Value does not adequately allege a misrepresentation, the Court dismisses this claim.

The crux of Retirement Value's claim rests on the allegation that Lincoln National knew that the Policies were STOLI policies yet continued to make representations to Retirement Value that the Policies were valid and continued to accept premiums, when it always knew that it would challenge the Policies when Retirement Value filed a death claim. (*See* Am. Countercls. ¶¶ 36-39, 65.) Retirement Value alleges that Lincoln National "had in place a system for identifying so-called STOLI policies," and it documented STOLI "red flags" related to the Policies. (*Id.* ¶ 65.) Retirement Value further alleges that Lincoln National has known about these red flags for over a decade. (*Id.* ¶ 37.) According to Retirement Value, Lincoln National's "nefarious and insidious" plan was to "demand and accept as much premium as possible, and later (after receiving a death claim) seek a judgment that it is entitled to keep all premium paid for the [Policies]." (*Id.* ¶¶ 38, 65.)

Retirement Value alleges that because Lincoln National knew that it would never honor claims under the Policies, any statement it made to the contrary is a material misrepresentation.

---

[6] Both parties rely on New Jersey law for the fraud claim. (*See* Def.'s Moving Br. 19-20; Pl.'s Opp'n Br. 25.)

Retirement Value provides multiple representations by Lincoln National that it (Retirement Value) believes qualify as misrepresentations. For example, Lincoln National submitted information to the Receiver related to the "identification and validity of life insurance policies that it issued in which Retirement Value had an ownership interest." (*Id.* ¶ 27.) In July 2010, Lincoln National processed the change of ownership and beneficiary forms for the Policies to Retirement Value and "demanded and accepted premiums for the Policies, issued verifications of coverage, annual statements, and other writings to Retirement Value stating or indicating that the Policies were valid and enforceable, and would be honored when a death claim was submitted under them." (*Id.* ¶¶ 29, 31.) Also, in August 2010, Lincoln National sent letters to Retirement Value confirming the ownership change of the Policies. (*Id.* ¶¶ 52, 53.) In September 2010, Lincoln National sent a letter confirming that the beneficiary had been transferred. (*Id.* ¶ 54.) Lincoln National "continued to communicate with the Receiver, providing annual account statements that state that the Policies [were] in force, and advising the amount of premium due and required . . . to keep them in force." (*Id.* ¶ 56.) Lincoln National, furthermore, provided Retirement Value with "In-Force Life Insurance Certificate Illustrations" for both of the Policies, which included the following statements: (1) "sufficient premium[s] must be paid to continue the certificate in force to the insured's age 121," and (2) "the death benefit in effect is shown in the 'Current Status Section' of this in-force certificate illustration," which reflected the accurate benefit amount. (*Id.* ¶¶ 57, 58 (internal quotations omitted).)

Retirement Value also alleges that Lincoln National provided information to Chris Orr, of TDI, in a letter ("March 2010 Letter") "concerning policies . . . that were owned by Retirement Value as of March 9, 2010." (*Id.* ¶ 28.) The March 2010 Letter included a notarized Affidavit for Authentication of Business Records signed by Lincoln National and a spreadsheet with details

about policies owned by Retirement Value.[7] (*Id.*) Retirement Value alleges that Lincoln National followed up with TDI and submitted an illustration for one of the policies, which Retirement Value contends "showed that Lincoln [National] considered the policy to be valid and enforceable." (*Id.* ¶ 30.) Retirement Value contends that these representations along with a "failure to disclose to Retirement Value and the Receiver . . . that it would seek to rescind or challenge the validity of the Policies reasonably caused the Receiver to believe that the [Policies] identified therein were valid and enforceable." (*Id.* ¶ 33.)

Retirement Value, however, fails to allege any plausible facts to support its assertion that Lincoln National knew, or should have known, that the Policies were unenforceable when they were procured in 2007. Even if the Court accepts as true that Lincoln National knew that the Policies contained STOLI red flags, it was not until June 4, 2019, that the New Jersey Supreme Court issued *Bergman*, which declared STOLI policies void as against public policy. Retirement Value is unable to show that any representation that Lincoln National made before that decision regarding the validity of the Policies was false because Lincoln National may, very well, have been required to pay the death benefits of the Policies regardless of whether they were STOLI policies or not. *See Columbus Life*, 2021 WL 1712528, at *7 ("[T]he Court finds that any alleged false statements about the [p]olicy's legitimacy that were communicated . . . prior to June 4, 2019 cannot serve as the basis for [the] claim because . . . [plaintiff] has failed to sufficiently allege that the statements were false at the time they were made.").

---

[7] The March 2010 Letter contained information about seven life insurance policies owned by Retirement Value, but it did not include the Policies because Retirement Value had not yet acquired them. (Am. Countercls. ¶ 28 ("The Policies that are the subject of this action were not listed on the spreadsheet because ownership of the Policies that are the subject of this action had not been transferred to Retirement Value as of March 10, 2010.").) The Court questions whether the March 2010 Letter is relevant at all as it does not concern the Policies, but because the Court finds that the March 2010 Letter does not qualify as a misrepresentation, it does not address this issue.

All the statements that Retirement Value alleges were false misrepresentations occurred before 2019 (mainly in 2010).[8] The Court, accordingly, dismisses this claim.

### 2. Negligent Misrepresentation

Retirement Value applies Texas law to this claim, and Lincoln National applies New Jersey law. (*See* Pl.'s Moving Br. 24; Def.'s Opp'n Br. 28.) The elements of negligent misrepresentation under Texas law are: (1) the representation is made by a defendant in the course of his business, or in a transaction in which it has a pecuniary interest; (2) the defendant supplies false information for the guidance of others in their business; (3) the defendant did not exercise reasonable care or competence in obtaining or communicating the information; and (4) the plaintiff suffers pecuniary loss by justifiably relying on the representation. *Borneo Energy Sendirian Berhad v. Sustainable Power Corp.*, 646 F. Supp. 2d 860, 869 (S.D. Tex. 2009). The elements of negligent misrepresentation under New Jersey law are: (1) the defendant negligently provided false information; (2) the plaintiff was a reasonably foreseeable recipient of that information; (3) the plaintiff justifiably relied on the information; and (4) the false statements were a proximate cause of the plaintiff's damages. *McCall v. Metro. Life Ins.*, 956 F. Supp. 1172, 1186 (D.N.J. 1996). Because the outcome is the same regardless of which state's law applies, the Court need not resolve any conflict. *High v. Balun*, 943 F.2d 323, 325 (3d Cir. 1991) ("[W]here the application of either state's law would yield the same result, no conflict exists to be resolved."). Here, the outcome is the same under either state's law because dismissal is warranted based on the overlapping requirement of false information.

For the same reasons that Retirement Value's fraud claim must be dismissed, so too must its negligent misrepresentation claim be dismissed. Retirement Value has not alleged facts that

---

[8] In any event, Haya Majerovic died "in or around 2019," the same year as *Bergman*. (First Am. Answer ¶ 63.)

Lincoln National provided information that was false at the time it was communicated. Retirement Value did not allege any misrepresentations that occurred after *Bergman*, and none that were demonstrably false prior to *Bergman*. The Court, therefore, dismisses this claim.

>  3. *Violations of the Texas Deceptive Trade Practices Act*

Retirement Value alleges that Lincoln National violated two provisions of the Texas Insurance Code: (1) § 541.060(a)(2)(A) for failing to attempt in good faith to effectuate a prompt, fair, and equitable settlement of the death claims submitted for the Policies where Lincoln National's liability has become reasonably clear; and (2) § 541.060(a)(7) for refusing to pay those death claims in their entirety under the Policies without conducting a reasonable investigation with respect to each claim. (Def.'s Opp'n Br. 30; Tex. Ins. Code §§ 541.060(a)(2)(A), 541.060(a)(7).) Because Retirement Value fails to state a claim under either of these provisions, the Court dismisses both.

Retirement Value's first claim under the Texas Insurance Code fails because it did not allege that Lincoln National's liability "has become reasonably clear." The crux of this dispute, both Lincoln National's declaratory judgment action and Retirement Value's counterclaims, is whether the Policies are STOLI policies and, therefore, void *ab initio* for violating New Jersey public policy, or whether they are valid and in force. In fact, Lincoln National has yet to deny the death claims filed by Retirement Value, and, rather, has sought a declaration from the Court as to the validity of the Policies. (Def.'s Opp'n Br. 11.) Until this question is answered, the Court finds it impossible to determine that Lincoln National's liability has become reasonably clear.

Retirement Value's second claim under the Texas Insurance Code fails for similar reasons. *First*, Retirement Value does not allege any facts that Lincoln National did not conduct a reasonable investigation of the claims. *Partain v. Mid-Continent Specialty Ins. Servs., Inc.*, 838 F. Supp. 2d 547, 560 (S.D. Tex. 2012) (granting motion to dismiss a § 541.060(a)(7) claim when

16

"none of [p]laintiff's . . . allegations asserts that [defendant] failed to conduct a reasonable investigation.") *Second*, the Court views Lincoln National's declaratory judgment action as an attempt to determine whether Lincoln National must pay the death benefits or not. (*See* Compl. 9 ("Lincoln National seeks, and is entitled to, a declaratory judgment declaring that the Policies lack an insurable interest and are void *ab initio* under New Jersey law.").) The Court, therefore, dismisses the claims under the Texas Insurance Code.

        4.     *Promissory Estoppel*

The parties do not appear to contest whether Retirement Value has sufficiently pled promissory estoppel, rather, they dispute whether the counterclaim is viable if the Policies are declared void *ab initio*. (Pl.'s Moving Br. 31; Def.'s Opp'n Br. 39.) Lincoln National argues that "[c]ourts evaluating similar promissory estoppel claims in the context of illegal STOLI transactions . . . have likewise dismissed such claims because an agreement against public policy cannot be enforced." (Pl.'s Moving Br. 32.) Retirement Value argues that it is not seeking to enforce an agreement that is void, rather, "it is seeking damages for Lincoln [National's] representations that the Policies were in [sic] valid and in-force." (Def.'s Opp'n Br. 39.)

Under New Jersey law, this Court cannot require a party to perform under a policy that is found to be void *ab initio*. *See Columbus Life*, 2021 WL 1712528, at *6 ("But under New Jersey law, if the [p]olicy is found to be void *ab initio*, this Court cannot order [a party] to abide by the terms of an agreement that 'never came into existence.'" (quoting *Bergman*, 208 A.2d at 857)). If the Policies are ultimately determined to be STOLI policies, the counterclaim cannot stand. Alternatively, if the Policies are found not to be STOLI policies, Retirement Value will not need to rely on the counterclaim. This counterclaim is, accordingly, dismissed.

17

## IV. CONCLUSION

For the above reasons, the Court grants in part and denies in part the Motion to Strike Affirmative Defenses and grants the Motion to Dismiss Counterclaims. The Court will enter an order consistent with this Memorandum Opinion.

/s/ Michael A. Shipp
MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE