NOT FOR PUBLICATION

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>Plaintiff,<br><br>v.<br><br>RETIREMENT VALUE LLC,<br><br>Defendant. | Civil Action No. 21-20438 (RK) (JBD)<br><br>**OPINION FILED UNDER TEMPORARY SEAL** |
| RETIREMENT VALUE LLC,<br><br>Counterclaim-Plaintiff,<br><br>v.<br><br>THE LINCOLN NATIONAL LIFE INSURANCE COMPANY,<br><br>Counterclaim-Defendant. | |

**KIRSCH, District Judge**

**THIS MATTER** comes before the Court on Cross Motions for Summary Judgment filed by Plaintiff and Counterclaim-Defendant The Lincoln National Life Insurance Company ("Lincoln"), (ECF No. 95), and by Defendant and Counterclaim-Plaintiff, Retirement Value LLC ("Retirement"), (ECF No. 94). Lincoln filed a Statement of Material Facts, ("Linc. SOF," ECF No. 95-1), and a Brief in support of its Motion, ("Linc. MSJ," ECF No. 95-2). Retirement filed a Responsive Statement of Material Facts, ("RV Resp. to Linc. SOF," ECF No. 97-1), in response to Lincoln's Statement of Material Facts, as well as a "Supplemental Statement of Material Facts,"

("RV Supp. SOF," ECF No. 97-2), and a Brief in Opposition, ("RV Opp. to Linc. MSJ," ECF No. 97). Lincoln filed a Response to Retirement's Supplement Statement of Material Facts, ("Linc. Resp. to RV. Supp. SOF," ECF No. 95-9), and a Reply brief, ("Linc. Reply," ECF No. 95-10). In support of its Motion for Summary Judgment, Retirement filed a Statement of Material Facts, ("RV SOF," ECF No. 94-2), and a Brief, ("RV MSJ," ECF No. 94-1"). Lincoln filed a Responsive Statement of Material Facts, ("Linc. Resp. to RV SOF," ECF No. 95-5), and a Brief in Opposition, ("Linc. Opp. to RV MSJ," ECF No. 95-7"), and Retirement filed a Reply brief, ("RV Reply," ECF No. 98). The Court has considered the parties' submissions and resolves the matter without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth below, Lincoln's Motion for Summary Judgment is **GRANTED**, and Retirement's Motion for Summary Judgment is **DENIED**.

## I.    <u>BACKGROUND</u>

In this action, Lincoln seeks a declaratory judgment that two life insurance policies insuring the life of Haya Majerovic ("Mrs. Majerovic") are stranger-oriented life insurance ("STOLI") policies and thus are void.

### A.    REGULATORY BACKGROUND

In New Jersey, "no one can procure a life insurance policy on a stranger's life and receive the benefits of the policy." *Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, 208 A.3d 839, 841 (N.J. 2019) (hereinafter "*Sun Life*"). This principal is codified at N.J. Stat. Ann. 17B:24-1.1(b), which provides as follows:

> No person shall procure or cause to be procured any insurance contract upon the life, health or bodily safety of another individual unless the benefits under that contract are payable to the individual insured or his personal representative, or to a person having, at the time when that contract was made, an insurable interest in the individual insured.

Under New Jersey law, a third party has an "insurable interest" in the life of the individual insured if the third party, *inter alia*, "has an expectation of pecuniary advantage through the continued life, health and bodily safety of that individual and consequent loss by reason of his death or disability." N.J. Stat. Ann. 17B:24-1.1(a)(4). Insurable interest also exists between people who are "closely related by blood or by law and in whom [there is] a substantial interest engendered by love and affection." N.J. Stat. Ann. 17B:24-1.1(a)(4).

By contrast, STOLI policies "commonly involve life insurance policies procured and financed by investors -- strangers -- who have no insurable interest in the life of the insured yet, from the outset, are the ultimate intended beneficiaries of the policy." *Sun Life*, 208 A.3d at 850. These stranger investors "fund[] a STOLI policy from the outset, which makes it possible to obtain a policy with a high face value." *Id.* at 848. "In other words, in a classic STOLI situation, a stranger who hopes the insured will die soon causes the policy to be procured and collects the death benefit." *Id.* The purpose of New Jersey's insurable interest requirement is to prevent STOLI policies through which the life of the insured is treated as a "wager." *Ameritas Life Ins. Corp. v. Wilmington Tr., N.A.*, No. 19-18713, 2022 WL 4596718, at *4 (D.N.J. Sept. 30, 2022) (citing *Grigsby v. Russell*, 222 U.S. 149, 154 (1911)).

Against this backdrop, the New Jersey Supreme Court recently held that STOLI policies are "void ab initio"—because a STOLI policy violates public policy, "it is as though the policy never came into existence." *Id.* at 857, 859 ("[A] life insurance policy procured with the intent to benefit persons without an insurable interest in the life of the insured . . . violate[s] the public policy of New Jersey, and such a policy is void at the outset."). Following the Supreme Court's decision in *Sun Life*, the New Jersey legislature enacted a statute expressly prohibiting STOLI policies, which provides: "[n]o person shall directly or indirectly engage in any act, practice or

arrangement that constitutes stranger-originated life insurance." N.J. Stat. Ann. § 17B:30B-18(a).

The legislature defined STOLI as "an act, practice or arrangement to initiate or procure the

issuance of a policy in this State for the benefit of a third-party investor who, at the time of policy

inception has no insurable interest under the laws of this State in the life of the insured," which

includes when:

> (a) a policy is purchased with resources or guarantees from or through a person or entity who, at the time of policy inception, could not lawfully initiate or procure the policy himself, herself, or itself; and
>
> (b) at the time of policy inception, there exists an arrangement or agreement, to transfer, directly or indirectly, the ownership of that policy or the policy benefits to a third party.

N.J. Stat. Ann. § 17B:30B-18(e)(1)–(2). Under New Jersey law, an insurer may contest a policy

as STOLI "at any time," notwithstanding the statutory requirement that life insurance polices have

a two-year incontestability clause. N.J. Stat. Ann. § 17B:30B-18(d).

### B.   FACTUAL BACKGROUND[1]

Having outlined the regulatory background underpinning this litigation, the Court turns to

the facts of this case.

---

[1] The factual background is taken from the parties' statements of material facts as outlined above and is supplemented with citations directly to exhibits in the record. However, Retirement has failed to respond in earnest to the vast majority of Lincoln's Statement of Material Facts—of the 133 factual assertions in Lincoln's submission, Retirement has only responded to 27. (*See generally* RV Resp. to Linc. SOF.) For example, Retirement does not respond to facts 1 through 52. (*Id.*) Retirement contends that it "has not wasted resources responding point-by-point to every one of the more than 130 purported 'facts,'" reasoning that "Lincoln has overwhelmed the Court" with "supposed 'facts,' all of which Lincoln uses to make a fraudulent argument for the application of New Jersey law" and for retaining the premiums paid by Retirement on the insurance policy. *Id.* The Court disagrees. First, as the Court will address further below, the Court has determined multiple times that New Jersey law applies in this case. Retirement's contention that Lincoln's facts pertaining to New Jersey are "fraudulent," and thus not worth responding to, is unavailing. Second, Retirement failed to respond to numerous facts that appear to contain straightforward and non-argumentative information. (*See, e.g.*, Linc. SOF ¶ 12 ("Mrs. Majerovic was born in Romania in 1934 and immigrated with her parents to the United States in 1962."); *id.* ¶ 16 ("In early 2007, Mr. Majerovic was at a wedding with his cousin, Rubin Meyer, who worked with the Halperts."); *id.* ¶ 24 ("The Trust Agreement, dated February 1, 2007, identified Haya Majerovic as grantor of the Haya Majerovic

1.  The Majerovic Family

Mrs. Majerovic was born in Romania in 1934 and immigrated to the United States in 1962. (Linc. SOF ¶ 12.) She and her husband were residents of Rockaway, New York. (RV SOF ¶ 15; ECF No. 31 ¶ 41.) By the early 2000s, the Majerovics were both retired. (Linc. SOF ¶ 13.) In 2007, they "owned about $20,000 to $25,000 in cash/securities as well as their residence, which was worth about $400,000 to $500,000." (*Id.* ¶ 15.) Their finances were handled by their son, Moshe Majerovic ("Mr. Majerovic"). (*Id.* ¶ 14.)

In 2007, Mr. Majerovic was approached by his cousin, Rubin Meyer ("Mr. Meyer"). Mr. Meyer was an insurance agent, who worked with insurance brokers, Gitel Halpert ("Mrs. Halpert") and her father, Yitzchok Halpert ("Mr. Halpert"). (*Id.* ¶ 16; *see also* ECF No. 95-17, Ex. E. at 9:9–12 ("Majerovic Depo.").) Mr. Meyer "suggested that Mr. Majerovic invest in a multi-million dollar life insurance policy on his mother's life." (*Id.* ¶ 18.) Mr. Majerovic responded that he could not afford to pay the premiums, but Mr. Meyer assured him that he "could get investors to invest." (*Id.* ¶¶ 19–20; Majerovic Depo. at 9:15–16.)

---

Family Trust (the "Trust"), and identified Mr. Majerovic, Lebowitz, and Gottheil as its trustees.").) The Court accepts facts to which Retirement failed to respond as undisputed and cites solely to Lincoln's Statement of Material Facts for those undisputed facts where appropriate. *See* L. Civ. R. 56.1(a) ("[A]ny material fact not disputed shall be deemed undisputed for purposes of the summary judgment motion."); *Hill v. Algor*, 85 F. Supp. 2d 391, 408 at n. 26 (D.N.J. Jan. 18, 2000) ("Under L. Civ. R. 56.1, facts submitted in the statement of material facts which remain uncontested by the opposing party are deemed admitted."); *Contreras v. United States*, No. 19-12870, 2022 WL 970192, at *1 (D.N.J. Mar. 31, 2022) (plaintiff's failure to submit a response to the defendant's statement of facts resulted in "each of the thirty-three facts set forth in the [defendant's facts] be deemed admitted and undisputed for purposes of this Motion"). Moreover, much of Retirement's own Statement of Facts contains what can only be described as legal argument. For example, Retirement dedicates 20 paragraphs to describing two federal court actions in which Lincoln was a party. (RV SOF ¶¶ 17–37.) "Statements that blur[] the line between fact and opinion and include arguments cloaked as undisputed facts are improper under [Rule 56.1]" and should "not be considered by the court." *Ill. Nat'l Ins. Co. v. Wyndham Worldwide Operations, Inc.*, 85 F. Supp. 3d 785, 792 (D.N.J. 2015).

### 2.  The Investors

In search of investors, Mr. Meyer and the Halperts turned to two organizations—Congregation Sons of Ateres Joshua ("Ateres Joshua") and Congregation Beis Shloma ("Beis Shloma") (collectively, the "Investors"). (Linc. SOF ¶¶ 1–5.) Among the members of Ateres Joshua were Samuel Teitelbaum ("Mr. Teitelbaum") and Moshe Lebowitz ("Mr. Lebowitz.") (*Id.* ¶ 2.) Among the trustees of Beis Shloma was Aaron Gottheil ("Mr. Gottheil"). (*Id.* ¶ 5.)

In 2007, Mr. Teitelbaum was approached by the Halperts, who told him about a "good investment"—"tak[ing] out a multi-million dollar insurance policy on the life of a 73-year old woman named Haya Majerovic." (*Id.* ¶ 6; *see also* "Teitelbaum Depo.," ECF No. 95-15, Ex. C at 34:13–15 ("I was approached by . . . brokers . . . [A]nd they told us it is a good investment for the congregation to buy a policy.").) Mrs. Majerovic had no relationship or association with Mr. Teitelbaum, Mr. Lebowitz, or Mr. Gottheil—whom, she had never met. (*Id.* ¶ 7.) According to Mr. Teitelbaum, the Investors' "purpose" was "to make money basically for the congregation." (Teitelbaum Depo. at 38:4–5; *see also id.* at 120:9–15 ("[W]e wanted to make money. Whatever money we could make, we would be happy . . . [W]e hoped to make big money."); *id.* at 113:2–5 ("The goal was to make the big money . . . the hope was to make big money if she passes away.").) According to Mr. Teitelbaum, "Plan A" was to make "big money" in the form of the death benefit; "Plan B" was to sell the policies for profit. (*Id.* at 39:13–17, 120:11–18.)

### 3.  The Trust Agreement

Mr. Meyers presented a deal to Mr. Majerovic wherein the Investors would pay the premiums to put the policy in force and maintain the policy until it was sold or matured, at which time Mr. Majerovic would be receive "10% of the policy proceeds, reduced by the amount of premiums paid, with the rest going to the Investors." (Linc. SOF ¶¶ 16–21; Majerovic Depo. at 29:2–4.) At the direction of her son, Mrs. Majerovic completed the required medical examination

for the policy in Brooklyn, New York, (ECF No. 31 ¶ 41), and on March 9, 2007, a life expectancy report on Mrs. Majerovic's life was prepared, (Linc. SOF at ¶ 49 n.6). Thereafter, this "deal" was memorialized in the Haya Majerovic Family Trust Agreement (the "Trust Agreement") dated February 1, 2007. (*Id.* ¶ 23.) The Agreement identified Mrs. Majerovic as grantor of the Haya Majerovic Family Trust (the "Trust") and identified Mr. Majerovic, Mr. Lebowitz, and Mr. Gottheil as its trustees. (*Id.* ¶ 24.) The Trust's situs was located in Lakewood, New Jersey. (*Id.* ¶ 25.) The Trust Agreement contained the following provisions:

> Upon the Grantor's death, or sale of the policy, the Trustees shall collect the proceeds of any life insurance policies on the Grantor's life owned by or made payable to the Trust. Said proceeds together with any other Trust assets and any other amounts made payable to the Trust shall be distributed as follows:
>
> Moshe Majerovic shall be entitled to receive ten percent (10%) of a sum equal to then principal and undistributed income of this Trust less the amounts paid as premiums toward any insurance policies owned by this trust.
>
> After the distribution pursuant to the previous paragraph has been made, the balance of all remaining monies shall be distributed as follows:
>
> CONGREGATION BEIS SHLOMA shall be entitled to receive sixty two and a half percent (62.5%) and
>
> CONGREGATION SONS OF ATERES JOSHUA shall be entitled to receive thirty seven and a half percent (37.5%).

(Linc. SOF ¶ 52, RV Resp. to Linc. SOF ¶ 52; "Trust Agreement" ECF No. 96-2, Ex. I at Art III, § C, *7–*8.)

### 4. The Policies

On or about March 8, 2007, Jefferson Pilot Life Insurance Company ("Jefferson Pilot") received an initial application seeking an $8 million life insurance policy on the life of Mrs.

Majerovic.[2] (Linc. SOF ¶ 27; *see also* ECF No. 96-3, Ex. J at *2.) The cover letter stated that the application "has been signed in NJ because it will be owned by a NJ trust." (ECF No. 96-3, Ex. J at *2.) The application also stated that it was signed in New Jersey on March 6, 2007 by Mrs. Majerovic and by Mrs. Halpert. (*Id.* at *8.) However, "[b]ecause the initial application did not have signatures for the proposed owner," on or about May 1, 2007, Jefferson Pilot received an amended version of the application. (Linc. SOF ¶ 32; *see also* "Application," ECF No. 96-1, Ex. G.) This version identified Mrs. Majerovic as the insured and "Pending Trust" as the owner and primary beneficiary. (Linc. SOF ¶ 34; Application at *2–*3.) It was signed in Lakewood, New Jersey by Mr. Majerovic, Mr. Gottheil, and Mr. Lebowitz as trustees, Mrs. Majerovic as the insured, and Mrs. Halpert as the insurance agent. (Linc. SOF ¶ 38; Application at *8.)

Along with the application, a "[F]inancial Supplement for Business and Personal Insurance" was also submitted, which falsely indicated that Mrs. Majerovic had a net worth of $13 million. (Linc. SOF ¶¶ 39–40; Application at *12; *see also* Linc. SOF ¶ 15.) This document was also signed in Lakewood, New Jersey by Mrs. Majerovic and Mrs. Halpert. (Linc. SOF ¶ 41; Application at *12.) Jefferson Pilot was not licensed to issue policies insuring the lives of New York residents unless the "unless the solicitation, sale, and delivery of the policy took place outside of New York." (Linc. SOF ¶ 42.) Finally, an "Out-of-State Sale Verification Form" was submitted to Jefferson Pilot, which identified New Jersey as the "State of Residence of Owner" and "State in Which Application was Signed." (*Id.* ¶¶ 43–44; *see also* ECF No. 96-5, Ex. L-1.) The form further provided that the policy was "principally negotiated, issued, and delivered" in New Jersey. (Linc. SOF ¶ 45; *see also* ECF No. 96-5, Ex. L-1.)

---

[2] Jefferson Pilot is the predecessor of Lincoln. (*See* Compl., ECF No. 1 ¶ 11; RV SOMF ¶ 1.)

On May 14, 2007, Jefferson Pilot's brokerage firm informed it that, instead of one policy for $8 million, they would like to issue two policies: one for $5 million and the other for $3 million, thus reflecting the Trust Agreement, which provided that Beis Shloma was entitled to 62.5% of the proceeds, or $5 million, and Ateres Joshua was entitled to 37.5% of the proceeds, or $3 million. (Linc. SOF ¶¶ 51–52.) This change was memorialized in an "Amendment to Application for Insurance." (*Id.* ¶ 53; *see also* ECF No. 96-11, Ex. R, ECF No. 96-12, Ex. S.)

Thereafter, according to Lincoln, Jefferson Pilot issued two policies on the life of Mrs. Majerovic: policy number JP5575311 with a $5 million death benefit ("5311 Policy") and policy number JP5581248 with a $3 million death benefit ("1248 Policy") (collectively, the "Policies"). (Linc. SOF ¶ 56.) According to Retirement, Jefferson Pilot did not issue *two* policies—rather, it issued two *certificates* which were issued pursuant to a *single group* policy.[3] (RV SOF ¶¶ 1, 9–10; RV Resp. to Linc. SOF ¶ 56.) Indeed, the first two lines of the first page of each "certificate" read as follows: "This certificate has been issued to the Certificate Owner at the request of the Group Policyholder. This certificate provides information about Group Policy GRP 10.LWL." (*See* ECF No. 96-13, Ex. T at *1 ("5311 Policy"); ECF No. 96-14, Ex. U *1 ("1248 Policy").) Lincoln, for its part, does not dispute that Jefferson Pilot issued this master group insurance policy with policy number GRP 10.LWL (the "Group Policy") and two certificates with policy numbers JP5575311 and JP5581248 under the Group Policy. (Linc. Resp. to RV SOF ¶ 1, ¶ 9; *see also* ECF No. 94-4, Ex. A ("Group Policy").) Lincoln explains that the Group Policy was held by Jefferson Pilot's Rhode Island-based trust. (*Id.* ¶ 2.) However, Lincoln contends that the Group Policy is irrelevant because this action does not challenge its validity, and Retirement is not a party to the Group

---

[3] As will be addressed further below, Retirement contends that Lincoln failed to disclose the existence of the Group Policy during discovery in an attempt to shield same from Retirement and from the Court. (RV SOF ¶¶ 46–55.)

Policy. (*Id.* ¶¶ 1, 5.) The Group Policy contains only a few lines, provides that the certificates issued pursuant to the Group Policy "will state the terms, conditions and benefits of coverage," and instructs that the provisions of the certificates supersede the Group Policy. (*Id.* ¶¶ 3–4.) According to Lincoln, it is those certificates—referred to throughout this litigation as "the Policies"—that are at issue.[4] (*Id.* ¶ 1.)

Throughout the existence of the Policies,[5] the premiums were paid solely by the Investors using funds transferred by the investors into a JPMorgan Chase Bank account which was controlled by the Investors and established for the Trust. (Linc. SOF ¶¶ 63–69; *see also* Majerovic Depo. at 60:16–20 (Q: "[D]id you ever at any time in the history of the world pay any premiums for this policy?" A: "No."); *id.* at 61:1–4 (Q: "[A]t any other time did your mom or anyone in your family pay a penny in premium for these two policies we're talking about here?" A: "No.").

### 5. Sale of the Policies from Investors to JSS

In June of 2009, the Investors began trying to sell the Policies. (Linc. SOF ¶ 74.) To solicit buyers, additional life expectancy reports on Mrs. Majerovic were obtained. (*Id.* ¶ 75.) On January 21, 2010, the Policies were purchased by James Settlement Services ("JSS")—"an entity that was

---

[4] Throughout Retirement's Responsive Statement of Material Facts, Retirement objects to Lincoln's facts which reference the Policies as "[d]isputed and fraudulent" because, according to Retirement, Lincoln "incorrectly refers to a Certificate as a 'Policy'" in an "attempt[] to ignore and avoid the Group Policy." (*See, e.g.*, RV Resp. to Linc. SOF ¶¶ 82–84, 88, 90, 93.) As it appears to the Court that Retirement is objecting to the use of the term "policy" versus the term "certificate," the Court deems these facts undisputed. As will be addressed further below, the Court finds that these certificates, which contain all of the relevant provisions and coverage information pertaining to Mrs. Majerovic and were held by the Trust, are, for all intents and purposes, the insurance policies at issue in this case.

The Court also notes that Retirement repeatedly objects to Lincoln's facts as "immaterial," contending that because New York law should apply in this case, the certificates may not be contested more than two years after they are issued under New York's incontestability provision. (*See, e.g.*, RV Resp. to Linc. SOF ¶¶ 76–77, 79–80, 86–87, 92, 94.) The Court also deems these facts undisputed to the extent that Retirement asserts no other basis for objecting to same. Moreover, these so-called responsive statements of fact are improper argument under Rule 56.1. *See Ill. Nat'l Ins. Co.*, 85 F. Supp. 3d at 792.

[5] The Court recognizes Retirement's objection to the use of the term "Policies," but the Court will continue to refer to them as such throughout this Opinion to avoid confusion.

aggregating policies for re-sale to [Retirement]." (*Id.* ¶¶ 81–85.) On March 29, 2010, Lincoln confirmed the change in the Policies' owner and beneficiary from the Trust to JSS and sent a copy of the confirmation to the Trust at its address in Lakewood, New Jersey. (*Id.* ¶¶ 88–90.) The proceeds from the sale were then disbursed to the Investors. (*Id.* at ¶¶ 91–94.) According to Mr. Majerovic, the policies were "sold without [his] permission" and he "didn't get anything for it." (Majerovic Depo. at 11:1–2; *see also id.* at 61:10–19 ("I knew it was sold because . . . the people who bought 'em were taken to court . . . I actually called up the next day to find out, you know, what happened . . . I was surprised that it was sold."); *id.* at 11:2–3 ("I didn't get any money . . . ."); *id.* at 61:5–7 (Q: "Did anyone in your family ever receive any death benefits on these policies?" A: "No.").)

6. <u>Sale of the Policies from JSS to Retirement</u>

In 2010, JSS sold the Policies to Retirement. (Linc. SOF ¶ 100.) Retirement is located in Texas, (RV SOF ¶ 43), and was formed in 2008 by Dick Gray ("Mr. Gray") to purchase life insurance policies from JSS and re-sell interests in those policies to other investors, (Linc. SOF ¶ 96; *see also* "Gray Affidavit," ECF No. 95-26, Ex. OO (explaining that Retirement's business "involved buying life insurance policies from a company called James Settlement Services . . . that bought policies from policyholders and then either kept them for itself or sold them to other clients like Retirement Value.").) According to Mr. Gray, he knew that certain "communities in and around Brooklyn, New York had been operating as a sort of life insurance policy mill . . . mean[ing] that a lot of the policies taken out on insureds living in those communities in the 2000s had been ginned up for the sole purpose of being owned by or sold to investors" in violation of the insurable interest requirements. (Gray Affidavit ¶ 8.) As a result, he began to "seriously question the legitimacy of trust-owned policies insuring the lives of insured from these areas." (*Id.* ¶ 9.) Ron James, owner of JSS, believed that "it was so bad that he would no longer be sourcing policies for Retirement

Value from those communities." (*Id.* ¶ 9.) In spite of this, Retirement did not independently evaluate the policies JSS offered to sell "for the presence (or absence) o[f] insurable interest" because Mr. Gray believed that JSS "would not sell [] a policy that wasn't any good." (*Id.* ¶ 10.)

Thus, when Retirement purchased the Policies in 2010 from JSS, it did not review the underlying information. (*Id.* ¶ 100.) However, since learning of the Policies at issue in this case, Mr. Gray attested as follows:

> I am disappointed that Ron James would have sold us these two policies after he told us that he was not going to be selling us these kinds of policies anymore. Had [JSS] told Retirement Value before we bought the Majerovic policies that these policies were trust-owned policies issued a little more than two years before with connections to the Brooklyn areas we knew enough by 2010 to know that we should not be buying those policies. We trusted Ron James to do the right thing, including selling us legitimate policies and not selling us policies he himself had identified as having insurable interest problems. In retrospect, trusting Ron James was a very bad decision.

(*Id.* ¶ 101; Gray Affidavit ¶ 13.)

### 7. <u>Investigation into Retirement</u>

In the spring of 2010, the Texas government raided Retirement's offices pertaining to alleged fraud perpetrated by Retirement related to its life insurance policies, and on March 29 and April 9, 2020 respectively, the Texas Securities Commissioner and the Texas Insurance Commissioner "entered emergency cease and desist orders against Retirement Value for unfair and deceptive trade practices and securities fraud." (Linc. SOF ¶ 102; *see also* ECF No. 95-27, Ex. SS ¶¶ 39–40.) After Retirement was shut down by the Texas Attorney General's office, a court in Travis County, Texas, on May 5, 2010, placed Retirement into receivership, appointing attorney Eduardo Espinosa ("Mr. Espinosa") as receiver. (Linc. SOF ¶ 103; "Espinosa Depo.," ECF No. 95-28, Ex. TT at 15:1–16:1.)

Mr. Espinosa was "aware of facts that could indicate that a policy was stranger oriented." (*Id.* at 39:15–16.) He was also aware of STOLI red flags, including that "a lot of STOLI policies were generated out of Brooklyn, New York," that "premium financing was often used in the acquisition of STOLI policies" especially premiums paid by "an investor or a promotor," and that STOLI policies often had numerous life expectancy reports generated on the individual which "suggests that somebody is shopping the life expectancy . . . ." (*Id.* at 39:16–40:2, 40:20–25; 46:18–21, 47:5–22.) Mr. Espinosa also knew that these policies reflected a "lack of a relationship between the owner and the insured," including agreements or arrangements made before the policy was issued through which investors paid for the premium in exchange for the right to the policy's death benefit. (*Id.* at 37:7–11; 46:24–47:4.)

As part of the Texas government's investigation into Retirement, on May 21, **2010**, the Texas Department of Insurance ("TDI") emailed Mr. Espinosa's attorney and partner indicating: "[m]any of these policies have the earmarks of Stranger Oriented Life Insurance ('STOLI') due, in part, to the (a) effective date, (b) ownership history, and (c) numerous life expectancies provided on the insured . . . ." (Linc. SOF ¶¶ 107–08; ECF No. 96-33, Ex. UU.) On June 29, 2010, TDI sent Mr. Espinosa life expectancy records from Retirement's policies, which demonstrated that ten life expectancy reports had been prepared on Mrs. Majerovic's life. (Linc. SOF ¶ 109; ECF No. 96-34, Ex. VV; ECF No. 96-19, Ex. BB at *9–*10.)

In August, 2010, Mr. Espinosa received the Policies and their supporting documents. (Linc. SOF ¶¶ 111–12.)[6] Among these materials was a purportedly altered trust agreement which, unlike the original Trust Agreement which provides that Mr. Majerovic was entitled to the 10% of the

---

[6] While Mr. Espinosa could not recall if all of the materials were received in 2010, he testified that all of the materials were received by 2012 at the latest. (Linc. SOF ¶ 113.)

death benefits or proceeds from the policy sale less the premiums, this version stated that the Investors, plus an additional congregation, were entitled to 100% of the benefits or proceeds. (*Compare* Trust Agreement, Art III, § C at *7–*8 *with* ECF No. 96-23, Ex. GG at *83–*84; *see also* Linc. SOF ¶¶ 114–116.) Nonetheless, Mr. Espinosa did not "do anything to investigate whether the Majerovic policies were supported by insurable interest" and continued paying the premiums on the Policies. (Linc. SOF ¶¶ 110, 117; Espinosa Depo. at 91:4–24, 115:21–116:9.) Mr. Espinosa testified that he was "still trying to figure out why [he] would" because "[i]t's a policy that has been validated as in force and in effect by the carrier, and the carrier is accepting [the] premiums on them and accepting [the] change of ownership form on them" and because he "largely expect[ed] people to do the right thing" and thus "had no reason to believe that the policy was void." (Espinosa Depo. at 116:9–13, 21–22, 117:1–2.) According to Retirement, as the receiver of Retirement's estate, Mr. Espinosa owed no duty to investigate the Policies. (RV Resp. to Linc. SOF ¶ 117.)

### 8.  Communication with Mr. Majerovic and Mrs. Majerovic's Death

Two years later, in March, 2012, Mr. Majerovic contacted Retirement's agent, Asset Servicing Group ("ASG") to advise that the Majerovics would no longer be cooperating with requests for updates on Mrs. Majerovic's health as they had not received any money when the policy was sold. (Linc. SOF ¶ 118.) This information was relayed to Mr. Espinosa who did not investigate same. (*Id.*) Years later, in November, 2017, ASG again contacted Mr. Majerovic who explained that he had documents reflecting an agreement under which he was entitled to receive either 10% of the sale of the policy or 10% of the death benefit—thereafter he sent the non-altered Trust Agreement to ASG. (*Id.* ¶¶ 19; ECF No. 96-36, Ex. YY; *see* Trust Agreement, Art. III, § C at *7–*8.) ASG forwarded the non-altered Trust Agreement to Mr. Espinosa. (Linc. SOF ¶ 121;

ECF No. 96-37, Ex. ZZ at *2 ("Here are the documents. I believe he is referring to Article III/Dispositive Provision, Page 6, Section C.").

Mr. Espinosa testified that he read the original Trust Agreement and understood that the agreement entitled "non-family member [Investors] to most of the death benefit." (Linc. SOF ¶ 123; Espinosa Depo. at 155:1–17.) He testified that, while he did not think about it at the time, the Trust Agreement suggests that Mr. Majerovic "wasn't paying any of the premiums." (Espinosa Depo. 163:4–164:11.) Mr. Majerovic continued to follow up with Retirement about the Policies, and in March, 2018, Mr. Espinosa contacted Mr. Majerovic to speak about same. (Linc. SOF ¶ 124; ECF No. 96-38, Ex. AAA at *5.) Mr. Espinosa gave Mr. Majerovic a $6,000 settlement offer, which Mr. Majerovic turned down. (Linc. SOF ¶¶ 125, 127; ECF No. 96-38, Ex. AAA at *3–*4.)

Less than a year later, on November 5, 2019, Mrs. Majerovic died, and Retirement submitted a claim to Lincoln to be paid the Policies' death benefits. (Linc. SOF ¶ 132.) Thereafter, Lincoln filed this action seeking a declaratory judgment that the Policies are STOLI and thus void.

## C.    PROCEDURAL HISTORY

Lincoln filed this action on December 9, 2021 seeking a declaratory judgment that the Policies at issue were void *ab initio* and requesting to retain the premiums paid on same. (ECF No. 1 ("Compl.").) Retirement answered on February 18, 2022, (ECF No. 10), and on May 16, 2022, filed an Amended Answer asserting numerous affirmative defenses and counterclaims, (ECF No. 31 ("Am. Answer")). On May 31, 2022, Lincoln field a Motion to Dismiss Counterclaims and Strike Affirmative Defenses. (ECF No. 35 ("MTD").) Lincoln also argued that New Jersey law controls this action. (MTD at 5–10.) In opposition, Retirement contended that New York law should apply. (ECF No. 47 at 12–21.)

On December 9, 2022, Judge Shipp issued a detailed Opinion, concluding that New Jersey law applied to this case because New Jersey had the most significant relationship to the Policies.

(ECF No. 64 at 6–9 ("MTD Op.").) Judge Shipp struck Retirement's waiver, laches, unclean hands, *in pari delicto*, ratification, and statute of limitations affirmative defenses, and dismissed Retirement's fraud, negligent misrepresentation, violations of the Texas Deceptive Trade Practice Act, and promissory estoppel counterclaims. (*Id.* at 9–17.)

On January 13, 2023, Retirement filed a Motion for Reconsideration. (ECF No. 75 ("MFR").) Retirement asked the Court to reconsider its decision that New Jersey law governs this case and its dismissal of the fraud and negligent misrepresentation counterclaims. (*See generally id.*) On May 15, 2023, the case was reassigned to the Undersigned. (ECF No. 79.) The Court denied Retirement's Motion. (ECF No. 89.)

Shortly thereafter, the parties filed the Cross-Motions for Summary Judgment now pending before the Court. (*See* Linc. MSJ; RV MSJ.) Lincoln moves for summary judgment on its declaratory judgment claim that the Policies lacked insurable interest under New Jersey law and on Retirement's breach of contract, bad faith, and premium refund counterclaims. (*See generally* Linc. MSJ.) Retirement moves for summary judgment on its breach of contract and bad faith counterclaims and for summary judgment dismissing Lincoln's Complaint, arguing that Lincoln's failure to present the Group Policy requires dismissal of this action due to Lincoln's "complete failure of proof" and that dismissal is warranted as a discovery sanction. (*See generally* RV MSJ.) The Court now turns to the pending motions.

## II.   <u>LEGAL STANDARD</u>

Federal Rule of Civil Procedure 56 provides that the Court should grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court must "view[] the facts in the light most favorable to the party against whom summary judgment was entered." *Marino v.*

*Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986)). The party moving for summary judgment has the initial burden of establishing its right to summary judgment. *See Celotex Corp.*, 477 U.S. at 323. Once the movant meets its threshold burden under Rule 56, the non-moving party must present evidence to establish a genuine issue as to a material fact. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In determining the existence of a genuine dispute of material fact, a court's role is not to weigh the evidence; all reasonable inferences and doubts should be resolved in favor of the nonmoving party. *Melrose, Inc. v. City of Pittsburgh*, 613 F.3d 380, 387 (3d Cir. 2010). But a mere "scintilla of evidence," without more, will not give rise to a genuine dispute for trial. *Saldana v. Kmart Corp.*, 260 F.3d 228, 232 (3d Cir. 2001); *see also Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-movant "must do more than simply show that there is some metaphysical doubt as to material facts."). The non-moving party must point to "concrete evidence in the record"—mere allegations, conclusions, conjecture, and speculation will not defeat summary judgment. *Orsatti v. New Jersey State Police*, 71 F.3d 480, 484 (3d Cir. 1995); *accord Jackson v. Danberg, 594 F.3d 210, 227* (3d Cir. 2010) ("[S]peculation and conjecture may not defeat summary judgment." (citation omitted)). Such evidence must be admissible at trial although it need not be in admissible form at the time of summary judgment. *FOP v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016). Moreover, a court need not adopt the version of facts asserted by the nonmoving party if those facts are "utterly discredited by the record [so] that no reasonable jury" could believe them. *Scott v. Harris*, 550 U.S. 372, 380 (2007). In such cases, summary judgment is still appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party." *Matsushita Elec. Indus. Co.*, 475 U.S. at 587.

III.    **DISCUSSION**

The Court will first address the threshold issue of whether New Jersey or New York law applies to this case, which was raised in both parties' summary judgment briefing.

A.    CHOICE OF LAW

Lincoln contends that New Jersey law applies, (Linc. MSJ 14–31), while Retirement argues that New York law applies, (RV MSJ at 18–26). The basis of the dispute boils down to the following. The parties agree that both Policies contain a two-year incontestability provision, which provides that an insurer cannot contest the validity of the policies after two years. (RV SOF ¶¶ 6, 14; Linc. Resp. to RV SOF ¶ 6, 14.) The Incontestability periods have clearly expired here as the Policies were issued in 2008. (*See* 1248 Policy at *6; 5311 Policy at *6.) Under New Jersey law, Lincoln can challenge the validity of the Policies for lack of insurable interest after the expiration of an incontestability period, *Sun Life*, 208 A.3d at 851,[7] while under New York law, Lincoln cannot, *AEI Life LLC v. Lincoln Benefit Life Co.*, 892 F.3d 126, 137–38 (2d Cir. 2018).

As noted above, Judge Shipp already determined that New Jersey law applies in this case. First, Judge Shipp explained that there is a significant conflict between New Jersey and New York law as it relates to the ability of an insurer to challenge a policy after the expiration of an incontestability period. (MTD Op. at 6.) Thus, Judge Shipp moved to the second inquiry: whether New Jersey or New York has the more significant relationship to the controversy, evaluating the connections between the Policies and each state. (*Id.* at 7.) Judge Shipp considered that Retirement alleged that the Policies were solicited and negotiated in New York, that Mrs. Majerovic was a

---

[7] *See also Ameritas Life Ins. Corp. v. Wilmington Tr., N.A.*, No. 19-18713, 2022 WL 4596718, at *6 (D.N.J. Sept. 30, 2022) ("Although the policy's two-year contestability period expired long ago, the New Jersey legislature has explicitly provided that a life insurer may contest a life insurance policy on the grounds that it is a void, STOLI policy at any time . . . Thus, the incontestability clause is not a bar to [the insurer's] claim for declaratory relief.").

New York resident at this time, that Mrs. Majerovic completed her required medical examination in New York, that the insurance agent was licensed and maintained an office in New York, and that two of the Trust's trustees resided in New York at this time. (*Id.*)

Judge Shipp then considered the substantial ties to New Jersey, including that the application for the Policies was signed in New Jersey, that the Policies were issued to a trust domiciled in New Jersey at its New Jersey address, and that the New Jersey trust was the sole owner and beneficiary under the Policies. (*Id.*) Judge Shipp also considered that both New York and New Jersey have strong public policies against STOLI transactions and that both states have insurance code provisions that require policies that are delivered or issued for delivery in their state comply with the respective state's laws. (*Id.* at 8.)

Ultimately, Judge Shipp determined that New Jersey law should apply. (*Id.*) Judge Shipp reasoned that the most important factor supporting New York is that Mrs. Majerovic was domiciled in New York, while the most important factors supporting New Jersey was that the Trust was domiciled in New Jersey and that the application for the Policies was both signed and delivered in New Jersey. Judge Shipp explained that the fact that two of the trustees lived in New York was not relevant as neither trustee was a contracting party on the Policies. (*Id.* at 8.)

As noted above, Retirement filed a Motion for Reconsideration of Judge Shipp's Memorandum Opinion, (MFR), and thereafter, this case was reassigned to the Undersigned, (ECF No. 79). Retirement asked the Court to reconsider Judge Shipp's choice-of-law decision, arguing that it was premature and that "discovery . . . after the date of the Opinion has revealed crucial factual information, including that the insured's son and trustee testified that he did not live in New Jersey at the time the Application was signed." (MFR at 10, 13–14.) First, the Court found no clear error in deciding the choice of law at the motion to dismiss stage. (MFR Op. at 7.) As to

Retirement's contention that discovery revealed Mr. Majerovic may not have lived in New Jersey when the application was signed, the Court concluded that this supposed new fact did not undermine Judge Shipp's ruling. (*Id.* at 7–8.) Judge Shipp relied on a number of other factors in his choice of law analysis, and expressly found that where the trustees lived was "not relevant" as they were not contracting parties. (*Id.* at 8 (citing *Sun Life Assurance Co. of Can. v. Wells Fargo Bank, NA.*, *as Sec. Intermediary*, No. 14-5789, 2016 WL 5746352, at *9 (D.N.J. Sept. 30, 2016) (finding a trustee's domicile irrelevant because "while [the trustee] may have resided in New York, he was not a contracting party—he was the trustee of the New Jersey-based Trust, and the Trust was one of the contracting parties.")); *see also* Trust Agreement at *21 (identifying Mr. Majerovic as a trustee).) Thus, the Court denied Retirement's reconsideration motion, (*id.* at 9), and Judge Shipp's choice of law decision remained the law of the case.

Now, Retirement is arguing for a third time that New York law should apply despite the Court's previous two opinions holding otherwise. This time, Retirement advances a new argument. Retirement contends that the Policies are not in fact insurance policies but rather *certificates* issued under the *Group Policy*, thus making the Court's previous decisions "not only wrong, but [also] the product of Lincoln misrepresenting the facts to the Court." (RV MSJ at 23 n.12.)

Notwithstanding the threadbare appeal of Retirement's argument, the Court is not persuaded for three reasons: (1) Retirement's novel argument that the Group Policy controls appears to be a last-ditch and self-serving argument that puts form over substance as the Group Policy contains none of the material terms and conditions and does not appear to reflect the parties' bargained-for exchange; (2) even if the Group Policy had any contractual effect, by its own explicit terms, it is superseded by the certificates issued pursuant to same; and (3) even accepting that the

Group Policy was delivered in New York, the Group Policy must simply comply with New York's insurance code—it does not follow that New York law must govern every aspect of this litigation.

First, the Group Policy is a single page and contains only a few general provisions. (Group Policy at *3.) It does not prescribe the terms, conditions, or benefits of the insurance coverage. (*Id.*) Rather, it provides that Jefferson Pilot "will issue a Certificate to each Certificate Owner," which "will state the terms, conditions and benefits of coverage." (*Id.*) Moreoever, as Lincoln points out, and Retirement does not dispute, Retirement is not an owner, policyholder, or beneficiary on the Group Policy.[8] (*See generally id.*; *see also* Linc. Resp. to RV MSJ at 12.)

The Policies—or certificates—by contrast, appear to contain all of the substantive provisions, including a section called "Insurance Coverage Provisions," which describes the death benefits provided pursuant to the Policies. (*See generally* 5311 Policy; 1248 Policy.) Each certificate expressly states: "[t]his certificate provides life insurance coverage to the death of the insured if sufficient premiums are paid." (5311 Policy at *6; 1248 Policy at *6.) Each certificate also states in multiple places: "[t]his certificate is intended to qualify as life insurance under the Internal Revenue Code." (5311 Policy at *16, *19; 1248 Policy at *16, *19; *see also* 5311 Policy at *14 ("We also reserve the right to refuse to make any change . . . if such change would cause this certificate to fail to qualify as life insurance under the Internal Revenue Code."; 1258 Policy at *14 (same).).) The certificates at issue—what the parties have referred to throughout this litigation as the Policies—were owned by the Trust, and later by Retirement, and their provisions pertain to the specific insured individual: Mrs. Majerovic. (*See generally* 5311 Policy; 1248 Policy.) These certificates operate, for all intents and purposes, as insurance policies—and indeed

---

[8] The owner of the Group Policy was Jefferson Pilot's Rhode Island-based trust; the Court also notes that Retirement's position that New York law should apply is undermined by the fact that the Group Policy states that its "governing jurisdiction" is Rhode Island and that the Policy "is subject to the laws of the Governing Jurisdiction." (Group Policy at *2.)

are the relevant policies at issue in this case.[9] The Court finds that Retirement's myopic argument that this "Group Policy" controls is an attempt to salvage the legally unsalvageable.

Second, even assuming arguendo that the Group Policy has any contractual effect, by its own explicit terms, it is superseded by the certificates: it provides that "any provisions of this [Group] Policy, which are inconsistent with provisions of the Certificate, are waived and superseded by the Certificate provisions." (Group Policy at *3.) This provision lends credence to the Court's conclusion that Retirement's belated attempt to rely on the facial designation of "Group Policy" to shoehorn application of New York law in order to get a financial windfall is without merit.

Third, even if the Court were to consider the merits of Retirement's argument for the application of New York law based on the Group Policy, the Court is not convinced that a different outcome is warranted. Namely, even if the Group Policy must *comply* with New York's insurance regulations, it does not necessarily follow that New York law governs this litigation. Retirement's argument is premised on N.Y. Ins. Law § 3201 ("Section 3201"), which provides that a group life insurance certificate that evidences insurance coverage on the life of a resident of New York "shall be deemed to have been delivered in this state, regardless of the place of actual delivery," subject to certain exceptions. N.Y. Ins. Law § 3201(b)(1). According to Retirement, because these certificates issued under the Group Policy insured Mrs. Majerovic, who was a New York resident, the certificates are deemed to have been delivered in New York and therefore must comply with

---

[9] The Court also notes that contemporaneous exhibits in the record refer to these certificates as insurance policies. (*See* ECF No. 96-23, Ex. GG. at *3 ("Please release all of the following Contracts, Docs, & policies to the [Retirement] receiver as soon as possible: . . . Haya Majerovic - $5 mil. Policy # JP5575311 – Lincoln Financial[;] Haya Majerovic - $3 mil. Policy # JP5581248 – Lincoln Financial"); *id.* at *4 ("Policy JP5575311 insuring, Haya Majerovic . . . Original policy and policy documents."); ECF No. 96-24, Ex. HH at *80–*99 (purchase agreement between the Trust and JSS for each Policy was entitled "Life Insurance Policy Purchase Agreement," included "Life Insurance Policy Information" pages that included "Policy No(s)" and "Policy Issue Date.").)

New York insurance law. (RV MSJ at 20–21.) It follows, Retirement contends, that New York law must apply in this litigation. (*Id.* at 21–23.)

There are two potential issues with this argument. First, as Lincoln points out, Section 3201 is not "a conflict-of-laws statute." (Lincoln MSJ at 21.) It does not instruct courts to apply New York law in any litigation involving a group policy that is deemed to have been delivered in New York. Rather, Section 3201 simply provides that all policies which are deemed to have been delivered in New York must be approved by New York's Insurance Superintendent as conforming with the requirements of New York's insurance code. N.Y. Ins. Law § 3201(b)(1). Retirement cites no case law that instructs this Court that an insurance policy's compliance with New York's insurance regulations is dipositive for a court's choice-of-law analysis.

Second, Retirement does not contest that an "Out-of-State Sale Verification Form" was submitted with the Policies, which provides that the Policies were "principally negotiated, issued and delivered in the state where the application was signed" and provides that this application was signed in New Jersey. (Linc. SOF ¶ 45; *see generally* RV Resp. to Linc. SOF (failing to respond to Linc. SOF ¶ 45); *see also* ECF No. 96-5, Ex. L-1.)[10] Nor does Retirement contest that Jefferson Pilot was not even licensed to issue policies insuring the lives of New York residents unless the policy was delivered *outside* of New York. (Linc. SOF ¶ 42.) It appears to the Court that these Policies were thus delivered in New Jersey, and New Jersey law, like New York law, has a provision that provides that insurance policies delivered in the state must conform with *New Jersey's* insurance provisions. N.J. Stat. Ann. §§ 17B:17-20.

---

[10] The Court also notes that Retirement fails to respond in earnest to Lincoln's factual assertion in paragraph 60 that "[t]he Polices were delivered in New Jersey to the Trust at its New Jersey address." (Linc. SOF ¶ 60.) Retirement sets forth essentially the same "response" as it did in fourteen other paragraphs, which objects on the basis that "Lincoln incorrectly refers to the Certificates as the 'Policies' . . . attempting to ignore and avoid the Group Policy." (RV Resp. to Linc. SOF ¶ 60.)

Lincoln contends that the state in which the Group Policy was delivered is not dispositive, but rather should simply be one factor in the Court's choice of law analysis. The Court could not find any case law confronting the circumstances of the instant case. Under the circumstances, and absent any authority, the Court agrees with Lincoln. As Judge Shipp explained, both New York and New Jersey have strong interests in regulating insurance policies delivered in their state as reflected in their states' insurance codes. (MTD Op. at 8.) Retirement fails to cite any legal authority for the proposition that the interests of the state in which the Group Policy was delivered should supplant the interests of the state in which the individual Policies were delivered—especially not where, here, the Group Policy states that its provisions are superseded by the individual Policies as set forth in the Certificates.[11] (Group Policy at *3); *see also  Sun Life Assurance Co. of Canada v. Wells Fargo Bank, N.A.*, No. 145789, 2016 WL 5746352, at *8–9 (D.N.J. Sept. 30, 2016), *aff'd sub nom. Sun Life Assurance Co. of Canada v. Wells Fargo Bank NA*, 779 F. App'x 927 (3d Cir. 2019) (hereinafter "*Bergman*") (finding policy issued to a New Jersey trust and signed in New Jersey was governed by New Jersey law, despite the insured being domiciled in New York).

Accordingly, the Court finds Judge Shipp's and this Court's decision that New Jersey has the most significant relationship to the Policies legally correct and thus should not be upended. *See*

---

[11] As will be addressed further below, the Court also notes the 2023 deposition of Lincoln's corporate representative, Kenneth Elder ("Mr. Elder"), during which Mr. Elder was asked about the Group Policy. (ECF No. 94-22, Ex. S at 31:6–32:3, 150:23–153:8 ("Elder Depo.").) Mr. Elder explained that the certificates were "unique to policies issued by Jefferson Pilot *in New Jersey*." (*Id.* at 31:25–32:3 (emphasis added).) Mr. Elder also testified that, based on his recollection, the life insurance products that were offered in the Policies were not available in New York. (*Id.* at 151:21–152:6.) Mr. Elder also explained that Jefferson Pilot's New York Company had a different name, "Jefferson Pilot Life America Insurance Company," and he was not aware of any group certificates available through that New York company. (*Id.* at 152:23–153:8.) While Mr. Elder at times had difficulty recalling all of the details of Jefferson Pilot's group policy offering—which Lincoln contends is because the Group Policy was not a noticed topic of Mr. Elder's deposition, (Linc. Resp. to RV SOF ¶¶ 51–54)—the Court finds that this deposition testimony bolsters the Court's conclusion that New Jersey law should apply in this case.

*In re Cont'l Airlines, Inc.*, 279 F.3d 226, 233 (3d Cir. 2002) ("[W]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case." (quoting *Christianson v. Colt Indus. Operating Corp.*, 486 U.S. 800, 816 (1988)); *see also Scudder v. Colgate Palmolive Co.*, No. 16-7433, 2018 WL 4188456, at *2 (D.N.J. Aug. 31, 2018) ("The law of the case doctrine 'limits relitigation of an issue once is has been decided' in the same case or litigation." (quoting *Hoffman v. City of Bethlehem*, 739 F. App'x 144, 150 (3d Cir. June 20, 2018)).

## 1. THE *HEBREW DAY SCHOOL* AND *BARUCH WEISS* ACTIONS

Finally, the Court briefly addresses Retirement's arguments based on two prior cases involving Lincoln: *Nat'l Soc'y for Hebrew Day Sch. v. Lincoln Nat'l Life Ins. Co.*, No. 14-970, 2016 WL 5107016, at *1 (E.D.N.Y. Mar. 31, 2016) (hereinafter, "*Hebrew Day School*") and *Weiss v. Lincoln Nat'l Life Ins. Co.*, No. 14-4944, 2016 WL 4991533, at *1 (E.D.N.Y. Sept. 15, 2016) (hereinafter, "*Baruch Weiss*"). Retirement makes much of the potential impact of these cases on the case at bar. (RV MSJ at 7–12, 21–23.) In both actions, the plaintiffs alleged that Lincoln failed to comply with New York's grace notice requirements and thus improperly cancelled their life insurance policies for non-payment of the policy premiums.[12] *See generally Hebrew Day School*, 2016 WL 5107016; *Baruch Weiss*, 2016 WL 4991533.

Retirement argues that Lincoln conceded in *Hebrew Day School* and *Baruch Weiss* that New York law should apply to certificates issued under this same Group Policy. (RV MSJ at 7–12.) Retirement thus contends that the doctrine of non-mutual collateral estoppel should prevent Lincoln from arguing that New Jersey law applies in this case. (*Id.* at 22 n.11.) Lincoln counters

---

[12] New York insurance law provides that policyholders are entitled to a grace period during which to pay sufficient premiums to keep an insurance policy in force, N.Y. Ins. Law § 3203(a)(1), and requires that insurers provide certain notice of same, N.Y. Ins. Law § 3211(b)(2).

that "Retirement Value's argument that Lincoln somehow admitted in the *Hebrew Day Schools* and *Baruch Weiss* cases that New York law governed the policies at issue there—and that Lincoln should therefore be collaterally estopped from denying that New York law governs the Policies at issue here—is profoundly false and misleading." (Linc. MSJ at 27.) Lincoln explains that neither of these cases pertained to insurable interest; rather, in each case, the policyholder had failed to pay requisite premiums, Lincoln sent a notice that a grace period had begun, and when the policyholder still failed to pay the premiums, Lincoln lapsed the policy, after which the policyholder sued, arguing that the grace notice did not satisfy New York law. (*Id.* at 28–30.) Lincoln contends that it suggested that New Jersey law should apply had the court performed a choice-of-law analysis, but that no such analysis was needed because the insurance laws of every applicable jurisdiction would lead to the same result. (*Id.* at 27.)

First, the Court notes upfront that neither of these unpublished out-of-Circuit cases are binding on this Court. Second, the Court has reviewed both actions and the arguments Lincoln advanced in those cases and does not find them inconsistent with Lincoln's positions here. In *Hebrew Day Schools*, Lincoln argued as follows: "[U]nder a choice of law analysis, either Rhode Island law or New Jersey law may apply to the Group Policy and the Certificate. [However,] there is no material conflict between Rhode Island, New Jersey and New York law on any of the matters at issue in this case, and that the Court need not engage in a choice of law analysis, but may simply apply New York law." (ECF No. 95-35, Ex. KKK at 20.) Nonetheless, Lincoln explained that "Lincoln is not engaged in business in New York; indeed, this case involves a Certificate that was: (1) applied for in the State of New Jersey; (2) by a New Jersey sited trust; and (3) actually delivered in the State of New Jersey." (*Id.* at 22.) Likewise, in *Baruch Weiss*, Lincoln contended that "there is no material difference between the relevant laws of Rhode Island, New Jersey and New York,

and analysis under the laws of any of these jurisdictions leads to an identical result – the dismissal of Plaintiff's claims." (ECF No. 94-12, Ex. I at 12.) As a result, neither court conducted a choice of law analysis.[13] (*See generally Hebrew Day Schools*, 2016 WL 5107016; *Baruch Weiss*, 2016 WL 4991533.) By contrast here, there is no dispute that there is a material conflict between New York and New Jersey as it relates to Lincoln's ability to challenge an insurance policy for lack of insurable interest after the expiration of the incontestability period, and Lincoln argues that New Jersey law should apply. The Court agrees and will apply New Jersey law in this case.

## B.    DISMISSAL BASED ON RULE 26

Next, the Court addresses Retirement's request for "summary judgment dismissing the Complaint." (RV MSJ at 26.) Retirement argues that Lincoln has nefariously hidden the existence of the Group Policy from Retirement and from the Court, warranting dismissal of this action under Federal Rule of Civil Procedure 26 ("Rule 26"). (*Id.* at 28–30.) Retirement contends that Lincoln has engaged in a "scam," a "subterfuge," and a "scheme" to "bamboozle" the Court and Retirement itself "to mislead the Court" into applying New Jersey law. (*Id.* at 1–3.)

According to Retirement, Lincoln's first, amended, and supplemental initial disclosures list the Policies and "files for the Policies" as relevant documents that may be used in this litigation. (*Id.* at 29.) Retirement argues that the Group Policy should have been disclosed as a "file for the Policies." (*Id.*) Retirement also contends that it requested "All Documents and Communications concerning" the Policies, which should have included the Group Policy. (*Id.*) On March 29, 2023, Retirement took the deposition of Lincoln's corporate representative, Mr. Elder, during which counsel for Retirement asked Mr. Elder about the reference to the Group Policy in the certificates.

---

[13] In fact, in *Hebrew Day Schools*, the court stated that the plaintiff "was entitled to a grace notice under New York, *as well as New Jersey and Rhode Island* statutory law." 2016 WL 5107016 at *2 (emphasis added).

(ECF No. 94-22, Ex. S at 31:6–32:3 ("Elder Depo."); *see also* RV SOF ¶¶ 51–53; Linc. Resp. to RV SOF ¶¶ 51–53.)[14]

Three months after Mr. Elder's deposition and following the close of discovery, Retirement requested the Group Policy for the first time. (RV SOF ¶ 55; Linc. Resp. to RV SOF ¶ 55; *see also* ECF No. 94-24, Ex. U at *3–*4.) Lincoln refused to produce the Group Policy contending that the Group Policy was not relevant to any claim or defense, and "Lincoln does not intend to rely on the Group Policy to support its claims or defenses in this action." (ECF No. 94-24, Ex. U at *1.) Lincoln further explained that it had produced 17,119 pages of material in response to Retirement's discovery requests, that it had informed Retirement more than five months prior that its production was substantially complete, and that discovery had closed months ago. (*Id.*)

Retirement now contends that dismissal of Lincoln's Complaint and an award of damages on Retirement's counterclaim for breach of contract is warranted because Lincoln intentionally violated Rule 26 by failing to disclose the Group Policy. (RV MSJ at 30.) Lincoln counters that "the suggestion that the existence of the Group Policy has been hidden from Retirement Value is absurd" as the Policies themselves, which Retirement concedes it has possessed since 2012 at the latest, plainly state that they were issued as certificates under the Group Policy. (Linc. Resp. to RV MSJ at 1–2.) Lincoln further argues that the Group Policy is irrelevant—Retirement is not a party to the Group Policy, and "no one is trying to have the Group Policy voided"—and had Retirement wanted the Group Policy, it should have requested the document during discovery. (*Id.* at 2.) Finally, Lincoln argues that "of course the whole issue is moot because Retirement Value obviously already has the Group Policy since it attached a copy of it to its motion." (*Id.*)

---

[14] Lincoln points out that the Group Policy was not a noticed topic for Mr. Elder's deposition. (Linc. Resp. to RV SOF ¶ 52).

Under Rule 26(a), a party must produce "all documents . . . that the disclosing party has in its possession, custody, or control and may use to support its claims or defenses, unless the use would be solely for impeachment . . . ." Fed. R. Civ. P. 26(a)(1)(A)(ii). Under Rule 26(e), a party is under a continuing obligation to supplement or correct its disclosures or discovery responses "in a timely manner if the party learns that in some material respect the disclosure or response is incomplete or incorrect, and if the additional or corrective information has not otherwise been made known to the other parties during the discovery process or in writing . . . ." Fed. R. Civ. P. 26(e)(1)(A).

First, the Court notes at the outset that Retirement never filed a motion to compel pursuant to Rule 26. Regardless, it does not appear that Lincoln violated its disclosure obligations under Rule 26(a). As discussed above, it is the *Policies* set forth in the Certificates that are being challenged as STOLIs in this case—not the Group Policy. It also does not appear that Lincoln violated its continuing obligations under Rule 26(e). As another court in this district has explained, Rule 26(e) does not serve as a "safe harbor" for failure to timely obtain discovery. *Faiella v. Sunbelt Rentals, Inc.*, 341 F.R.D. 553, 563 (D.N.J. 2022) (quoting *Dag Enterprises, Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 110 (D.D.C. 2005)). Retirement offers no explanation for its failure to request the Group Policy during the discovery period and fails to explain why it could not have obtained the Group Policy during this time. *Id.* (explaining that a party's Rule 26(e) argument is without merit because the party failed to request the information during discovery or explain why it could not have obtained same during discovery).

Moreover, Rule 26(e) only applies to information not otherwise known to the parties. *See* Fed. R. Civ. P. 26(e)(1)(A). Retirement's argument that it was unaware of the Group Policy because Lincoln hid its existence from Retirement strains credulity. As noted above, the first two

lines of the very first page of each of the Policies state that they were issued under Group Policy GRP 10.LWL. Retirement possessed these Policies for well over a *decade* before requesting the Group Policy from Lincoln. (Espinosa Depo. at 104:8–108:14 testifying that he received documents in 2010 and at the latest by 2012); *see also* ECF No. 96-23, Ex. GG at *3–*4 (demonstrating that the Policies were sent to Mr. Espinosa on August 3, 2010); ECF No. 96-24, Ex. HH at *2 (demonstrating that physical copies were mailed to Mr. Espinosa on August 5, 2010).) Clearly, it is apparent to the Court that Retirement was indeed in possession of the Group Policy as Retirement attached same to its Motion for Summary Judgment. (ECF No. 94-4, Ex. A.)

More importantly, even presuming that Lincoln violated Rule 26, dismissal of Lincoln's Complaint and an award of damages on Retirement's breach of contract Counterclaim would not be warranted under these circumstances. Rule 37 governs the sanctions a party may seek for the opposing party's failure to comply with Rule 26. While there is a panoply of sanctions authorized by Rule 37 for a party's failure to comply with Rule 26, district courts are countenanced that the sanction of dismissal should be turned to most sparingly. The Third Circuit has cautioned that dismissal is an "extreme" sanction—which must be "reserved for the instances in which it is justly merited." *Poulis v. State Farm Fire and Cas. Co.*, 747 F.2d 863, 870 (3d Cir. 1984); *see also United States v. $8,221,877.16 in U.S. Currency*, 330 F.3d 141, 161 (3d Cir. 2003) ("As we have often noted, the sanction of dismissal is disfavored absent the most egregious circumstances." (citation omitted)); *Hoxworth v. Blinder, Robinson & Co., Inc.*, 980 F.2d 912, 922 (3d Cir. 1992) ("As we have repeatedly stressed, dismissal must be a sanction of last, not first, resort." (cleaned up)).

When contemplating whether to impose the sanction of dismissal, courts in the Third Circuit consider the following factors, often referred to as the *Poulis* factors: "(1) the extent of the *party*'s personal *responsibility*; (2) the *prejudice* to the adversary caused by the failure to meet

scheduling orders and respond to discovery; (3) a *history* of dilatoriness; (4) whether the conduct of the party or the attorney was *willful* or in *bad faith*; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of *alternative* sanctions; and (6) the *meritoriousness* of the claim or defense." *Id.* at 868 (emphasis in original). Retirement does not address the *Poulis* factors, instead simply asserting—without citation to any legal authority—that dismissal is warranted here. (RV MSJ at 28–30.) Retirement did not move to compel production of this document or seek a Court order or any other sanctions with respect to Lincoln's failure to produce same. Moreover, Retirement cannot demonstrate that it was prejudiced by Lincoln's alleged discovery violation as Retirement apparently had the document it sought from Lincoln all along. (*See* ECF No. 94-4, Ex. A.) Accordingly, Retirement's request for dismissal is denied. *See Dambrowski v. Fin. Recovery Servs., Inc.*, No. CV 05-3548, 2006 WL 8457153, at *2 (D.N.J. Feb. 2, 2006) (denying request for dismissal when defendant asserted no prejudice and failed to address the *Poulis* factors or articulate why dismissal was the only appropriate sanction). Accordingly, Retirement's Motion for Summary Judgment dismissing the Complaint is **DENIED**.

### C. STOLI POLICIES

Having determined that New Jersey law applies, and dismissal of Lincoln's Complaint is not warranted under Rule 26, the Court turns to the question at the heart of this declaratory judgment action: whether the subject Policies are STOLI. Without question, the Court concludes that they are.

Lincoln argues that the Policies lacked insurable interest because "third-party Investors without any relationship to Mrs. Majerovic decided that they wanted to invest in $8 million of insurance on her life." (Linc. MSJ at 32.) Lincoln contends that the Investors paid the premiums on the Policies, and although the Policies' nominal beneficiary was the Trust, the Trust Agreement

provided that the Investors would receive 90% of the Policies' death benefits, or proceeds of the

sale of the Policies, plus the reimbursement of all premiums paid. (*Id.* at 33.)

The Court finds it instructive to compare the case at bar to the seminal case of *Bergman*,

which was described by the Honorable Kevin McNulty, U.S.D.J. as follows:

> In that case . . . the initial owner and beneficiary of the policy at
> issue was a trust, and the grandson of the insured was the trustee. []
> The trust had four additional members, all of whom were strangers
> to the insured, and the investors deposited money into the trust
> account to pay for most if not all of the policy's premiums. [] Five
> weeks after the policy was issued, the insured's grandson resigned
> as trustee and appointed the four stranger investors as co-trustees. []
> Over two years later, once the contestability period had expired, the
> investors sold the policy to a life settlements company, and it was
> then sold again before Wells Fargo purchased it, several years
> before the insured's death. [] The New Jersey Supreme Court
> characterized the arrangement as a STOLI transaction and held that
> such STOLI policies "run afoul of New Jersey's insurable interest
> requirement and are against public policy." []

*Ameritas Life Ins. Corp. v. Wilmington Tr., N.A.*, No. 19-18713, 2022 WL 4596718, at *4 (D.N.J.

Sept. 30, 2022).

In *Bergman*, the district court granted summary judgment to the insurer and declared the

policy void *ab initio* for lack of insurable interest. The court reasoned that the investors "funded

the premiums with the intent to sell the Policy on the secondary market or collect the benefit."

*Bergman*, 2016 WL 5746352, at *10.[15] The *Bergman* court explained that, even though there was

---

[15] The Court notes that the district court granted summary judgment for the insurer on the basis that the policies were STOLI and therefore void *ab initio*. *Bergman*, 2016 WL 5746352. The district court also granted partial summary judgment for the defendant, finding it was entitled to a partial refund of premium payments. The parties cross-appealed. *See Sun Life Assurance Co. of Canada v. Wells Fargo Bank NA*, 779 F. App'x 927, 928 (3d Cir. 2019). To resolve the appeals, the Third Circuit certified two questions to the Supreme Court of New Jersey: (1) "does a life insurance policy that is procured with the intent to benefit persons without an insurable interest in the life of the insured violate the public policy of New Jersey, and if so, is that policy void ab initio?" and (2) "if such a policy is void ab initio, is a later purchaser of the policy, who was not involved in the illegal conduct, entitled to a refund of any premium payments that they made on the policy?" *Id.* The Supreme Court answered both questions in the affirmative. *See generally Sun*

a factual dispute as to how wealthy the insured actually was, "it seem[ed] clear that she did not have the means for the policies that were taken out." *Id.* The investors did not know the insured, conceded that the plan from the beginning was to either collect the death benefit or sell the policy, and deposited money into a trust's bank account to pay the premiums. *Id.* There was no evidence in the record that the insured or her grandson personally funded any of the premiums. *Id.* After the policy was issued, the grandson resigned as a trustee, and the investors were named as successor trustees to receive 95% of the death benefits upon the death of the insured or 90% of the proceeds from the sale of the policy. *Id.* Finally, none of the proceeds ultimately went to anyone with an insurable interest when the policy was sold. *Id.*

The facts in *Bergman* are essentially identical to those in the case at bar. It is uncontested that neither the insured (Mrs. Majerovic) nor her son (Mr. Majerovic) had the means to fund the Policies. (Linc. SOF ¶¶ 13–15; *see also* Linc. SOF ¶¶ 39–30 (explaining that the application for the Policies misrepresented Mrs. Majerovic's net worth); Majerovic Depo. at 40:25–41:2 (describing his parents as a "retired . . . middle class family"); *id.* at 44:8–19 (9:15–16 (explaining neither he nor his parents could not have afforded the premiums); Application at *12.) Mrs. Majerovic had no relationship or association with the Investors. (Linc. SOF ¶ 7; Teitelbaum Depo. at 113:17–114:6 ("I did not meet her . . . The main thing, you know, the main thing was to make - - to raise money . . . ."); Majerovic Depo. at 39:12–13 ("[Mrs. Majerovic] had nothing to do with any of these organizations."); *id.* at 152:11–13 ("I didn't know Lebowitz or Gottheil from a hole in the wall."); ECF No. 95-18, Ex. F. at 50:18–25 ("Lebowitz Depo.) ("Q: Have you ever met Haya Majerovic? A: No. Q: Have you ever spoken to Haya Majerovic? A: No.").) The Investors

---

*Life*, 208 A.3d. Thereafter, the Third Circuit affirmed the district court's summary judgment decision. *See Sun Life Assurance Co. of Canada*, 779 F. App'x at 929.

conceded that the goal was simply to make money by either collecting the death benefit or selling the policy. (Teitelbaum Depo. at 38:4–39:17, 120:9–18 (explaining that Plan A was to make "big money" in the form of the death benefit and Plan B was to profit off the sale of the policies).

The Investors set up a bank account for the Trust into which they deposited funds to pay the Policies' premiums. (*Id.* at 60:11–61:19, 119:2–13 (explaining that Mr. Lebowitz established the bank account); *see also* Majerovic Depo. at 57:6–8 ("Q: Did you ever create a bank account for The Haya Majerovic Family Trust? A: No."), *id.* at 60:6–12 ("Q: Did your mom create The Haya Majerovic Family Trust bank account with Chase? A: No . . . Q: Did anyone else in your family create this bank account? A: No.").) The Investors funded the Policies from the outset so that they could obtain policies with a higher value; there is no evidence in the record that the Majerovics ever personally funded the premiums for the Policies. (Majerovic Depo. at 59:5–60:5 (testifying that no one in the Majerovic family signed the checks that were deposited into the Trust's bank account); *id.* at 60:16–20 (Q: "[D]id you ever at any time in the history of the world pay any premiums for this policy?" A: "No."); *id.* at 61:1–4 (Q: "[A]t any other time did your mom or anyone in your family pay a penny in premium for these two policies we're talking about here?" A: "No.").)

While Mr. Majerovic was listed as one of the trustees, before the Policies were ever applied for, the Investors secured a contractual right to 90% of the Policies' death benefits, or the proceeds of the sale of the Policies. (Trust Agreement, Art III, § C, *7–*8.) Moreover, even though Mr. Majerovic was purportedly entitled to 10% of the proceeds less the amounts paid as premiums, when the Policies were sold to Retirement, Mr. Majerovic never received any money. (Majerovic Depo. at 11:1–2 ("[I] didn't get anything for it."), 11:2–3 ("I didn't get any money . . . ."), 61:5–7 (Q: "Did anyone in your family ever receive any death benefits on these policies?" A: "No.").)

What's more, when Retirement purchased the Policies, they received a version of the Trust Agreement which provided that the Investors were entitled to *100%* of the death benefits or proceeds, which presumably had been altered in an apparent attempt to undo Mr. Majerovic's already minimal financial entitlement. (*Compare* Trust Agreement, Art III, § C at *7–*8 *with* ECF No. 96-23, Ex. GG at *83–*84.)

The fact that Mr. Majerovic was purportedly entitled at the outset to 10% of the death benefits or proceeds does not mandate a different result. As noted above, New Jersey law forbids any person from procuring, or causing to be procured, an insurance policy that lacks insurable interest. N.J. Stat. Ann. 17B:24-1.1(b). In determining "who in fact procured or affected" a policy, one "telltale sign" is when "a third party funds the premium payments by providing the insured the financial means to purchase the Policy . . . ." *Bergman*, 2016 WL 5746352, at *10. Here, it is clear that Mr. Majerovic did not procure or affect the Policies because he did not fund the premium payments. *See Sun Life*, 208 A.3d at 850 ("In short, the outside investors who funded the policy effectively control[led] it from the start."). In *Bergman*, the trust provisions provided that, if the policy were sold, the insured's grandson would receive 10% of the proceeds, less the amounts paid as premiums—facts identical to those here. 2016 WL 5746352, at *3. The district court found this arrangement was STOLI, *id.* at *11, and the Third Circuit affirmed, *Sun Life Assurance Co. of Canada v. Wells Fargo Bank NA*, 779 F. App'x 927, 929 (3d Cir. 2019). In sum, the Policies at issue in this case are undoubtedly STOLI. *See Kunstlinger as Tr. of Pinchas Stolper Ins Tr. 3/06/08 v. Lincoln Benefit Life Co.*, No. 22-04534, 2023 WL 4669424, at *3 (D.N.J. July 20, 2023) (finding insurer had sufficiently stated a counterclaim that a policy was void *ab initio* because it alleged that investors created a trust shortly before applying for the policy and application misrepresented the insured's net worth to conceal the source of the premium payments which were funded by

stranger investors); *Ohio Nat. Life Assur. Corp. v. Davis*, No. 10-4241, 2010 WL 4916643, at *3 (C.D. Cal. Dec. 1, 2010) (granting motion for preliminary injunction, finding insurer was likely to demonstrate that the policies were STOLI, because even though the trust's beneficiaries were the insureds' wives, stranger investors controlled the trust, and thus the arrangement was initiated for the benefit of those stranger investors).

Retirement does not meaningfully attempt to challenge that the Policies are STOLI. Its representative, Mr. Gray, attested that had Retirement evaluated the Policies for insurable interest, it would not have bought them due to "insurable interest problems." (Gray Affidavit ¶ 13.) Retirement's receiver, Mr. Espinosa, also testified that he understood numerous aspects of the Policies to be STOLI red flags. (Espinosa Depo. at 37:7–11, 39:16–40:2, 40:20–25; 46:18–47:22.) Moreover, Retirement's own expert, Gail Keren ("Ms. Keren"), repeatedly testified that the Policies were STOLI policies. At first, Ms. Keren testified that the underlying transaction did not appear to be STOLI on its face because "Moshe is the son and has an insurable interest in the life of his mother, Haya." (ECF No. 95-31, Ex. GGG at 74:25–75:7 ("Keren Depo.").) However, once informed that "the testimony in this case has been that third parties, without any relationship to Ms. Majerovic, paid the premiums for these two policies and that before these two policies were issued, those investors owned the right to 90 percent of the death benefit," Retirement's expert changed her tune and testified: "Yes, I believe this was a STOLI transaction." (*Id.* at 75:10–19.) She then repeatedly testified that the Policies were STOLI. (*Id.* at 75:21–24 ("[W]ith the deposition in mind . . . yes, I believe this was a STOLI transaction."); *id* at 97:2–3 ("And I think we agree that it's a -- that it looks to us to be a STOLI transaction."); *id.* at 100:16–17 ("[I]t's a STOLI transaction in a STOLI environment."); *id.* at 138:10–12 ("[W]e believe that this was a STOLI transaction and Moshe said that he didn't receive any money for it.").)

36

Rather than contest that the Policies were STOLI, Retirement argues that whether the Policies were STOLI is "immaterial" because New York's incontestability laws preclude Lincoln's challenge to the Policies' validity. (RV MSJ at 7.) Retirement also argues that New Jersey's insurable interest requirement does not apply to group life insurance and repeats its argument that New Jersey law does not apply because the Group Policy should be regulated by the state of residence of the insured—which would be New York. (*Id.* at 13–14.) The Court has already addressed these arguments above and concluded, now for the third time, that New Jersey law applies. The Court will not revisit those arguments again here. Accordingly, the Court finds that the Policies are void *ab initio* for lack of insurable interest, and Lincoln's Motion for Summary Judgment on its declaratory judgment claim is **GRANTED**.

### D.    RETIREMENT'S COUNTERCLAIMS

The Court now turns to Retirement's remaining counterclaims for breach of contract, bad faith, and a refund of premium payments.

#### 1.    BREACH OF CONTRACT AND BAD FAITH

Retirement asserts a breach of contract counterclaim, alleging that Lincoln breached the Policies by failing to pay the Policies' respective death benefits. (Am. Answer ¶¶ 67–77.) Lincoln moves for summary judgment on this counterclaim, arguing that the claim must fail because the Policies are void *ab initio*. (Linc. MSJ at 40–41.) Retirement also moves for summary judgment on this counterclaim, arguing that New York law applies and thus Lincoln can no longer contest the validity of the Policies and must pay the death benefits to Retirement. (RV MSJ at 18–26.)

The Court has already determined that New Jersey law applies, and the New Jersey Supreme Court has explained that "[w]hen an insurance policy violates public policy, it is as though the policy never came into existence." *Sun Life*, 208 A.3d at 857 (citing *D'Agostino v. Maldonado*, 78 A.3d 527, 543 n.4 (N.J. 2013) ("A contract may be void because it is technically

defective, contrary to public policy, or illegal . . . A void contract is a contract that is of no legal effect, so that there is really no contract in existence at all." (cleaned up)). Because a breach of contract claim may not be asserted in the absence of a valid contract, the Third Circuit has explained that summary judgment on a breach of contract counterclaim is warranted where an insurance contract has been declared void *ab initio*. *Nw. Mut. Life Ins. Co. v. Babayan*, 430 F.3d 121, 136 (3d Cir. 2005) ("Because the District Court correctly concluded that the disability insurance contract was void ab initio, the District Court did not err in granting [the insurer's] motion for summary judgment as to [the defendant's] breach of contract claim. It is axiomatic that a breach of contract claim may not be maintained in the absence of a valid contract."); *see also Sun Life Assurance Co. of Canada v. Conestoga Tr. Servs., LLC*, 263 F. Supp. 3d 695, 704 (E.D. Tenn. 2017), aff'd, 717 F. App'x 600 (6th Cir. 2018) ("In light of the court's finding that the policy at issue is void as an illegal wagering contract, [defendant] has no viable bad faith claim. The record establishes that there was a reasonable basis for [the insurer's] challenge to the validity of the policy. The law is clear that there is no viable bad faith claim where the insurer's refusal to pay rests on legitimate and substantial legal grounds.). Having determined that the Policies were void *ab initio*, summary judgment for Lincoln is thus warranted on Retirement's breach of contract counterclaim. Accordingly, Lincoln's Motion for Summary Judgment as to Retirement's breach of contract counterclaim is **GRANTED**, and Retirement's Motion for Summary Judgment as to its breach of contract counterclaim is **DENIED**.

Retirement also asserts a bad faith counterclaim, alleging that Lincoln had no reasonable basis for denying or delaying payment of the death benefits owed under the Policies. (Am. Answer at 98–102.) Lincoln moves for summary judgment on this counterclaim, arguing that "[i]t is not bad faith to fail to perform a contract that does not exist." (Linc. MSJ at 41.) Retirement also moves

for summary judgment on this counterclaim, contending that no reasonable basis exists to deny Retirement's claim for the death benefits because Lincoln's argument that New Jersey law applies and subsequent refusal to pay claims on the Policies is "wrongful." (RV MSJ at 30–32.)

Retirement's bad faith counterclaim fails for the same reason as its breach of contract counterclaim. Lincoln cannot be liable for denying payment under the Policies because the Policies are void. *See State Auto Prop. & Cas. Ins. Co. v. Sigismondi Foreign Car Specialists, Inc.*, No. 21-2435, 2022 WL 17076035, at *3 (3d Cir. Nov. 18, 2022) (explaining that a declaratory judgment that an insurance policy was void "dooms" a counterclaim for bad faith—"[b]ecause the policy was void . . . [the insurer] cannot be liable for bad daith denial" of a claim under the policy). Accordingly, Lincoln's Motion for Summary Judgment as to Retirement's bad faith counterclaim is **GRANTED**, and Retirement's Motion for Summary Judgment as to its bad faith counterclaim is **DENIED**.

## 2. PREMIUM REFUND

Finally, the Court turns to Retirement's counterclaim for a refund of the premiums it paid towards the Policies. (Am. Answer ¶¶ 117–24.) Unlike Retirement's other remaining counterclaims, the fact that the Policies are void is not dispositive here. The Supreme Court of New Jersey has explained that "[d]epending on the circumstances, a party may be entitled to a refund of premium payments it made on a void STOLI policy, particularly a later purchaser who was not involved in any illicit conduct." *Sun Life*, 208 A.3d at 859. To determine whether a party is entitled to a refund, courts must conduct a "fact-sensitive" inquiry, involving "develop[ing] a record and balanc[ing] the relevant equitable factors." *Id.* Those factors include "a party's level of culpability, its participation in or knowledge of the illicit scheme, and its failure to notice red flags." *Id.*

Lincoln contends that it is entitled to summary judgment on Retirement's counterclaim for recoupment of the premiums it made on the policy. (Linc. MSJ at 41–45.) Lincoln argues that the record demonstrates that Retirement had actual knowledge or was, at the very least, on notice that that the Policies were STOLI. (*Id.*) According to Lincoln, Retirement had actual knowledge that the Policies were STOLI because it received the Policies and all of the relevant policy documents by 2012 at the latest, including an altered version of the Trust Agreement that provided that the Investors were to receive *100%* of the death benefits or proceeds of the sale of the Policies. (*Id.* at 43; *see also* Linc. SOF ¶¶ 111–13; ECF No. 96-23, Ex. GG at *3–*4; ECF No. 96-24, Ex. HH at *2; ECF No. 96-32. Ex. GG at *83–*84.)

Lincoln further contends that Retirement was at least on notice of numerous STOLI red flags—including that the Policies were generated out of Brooklyn, New York, that they involved premiums wholly funded by the Investors and memorialized in an agreement made before the Policies were issued, and that numerous life expectancy reports had been generated on the life of Mrs. Majerovic—and Retirement's receiver, Mr. Espinosa, testified that he understood these to be STOLI red flags. (Linc. MSJ at 43; Espinosa Depo. at 37:7–11, 39:16–40:2, 40:20–25; 46:18–47:22.) Furthermore, as part of TDI's investigation into Retirement, a TDI representative notified Mr. Espinosa that many of Retirement's policies had the "earmarks" of STOLI policies and sent Retirement the life expectancy records from Retirement's policies, which demonstrated that *ten* life expectancy reports had been prepared on Mrs. Majerovic's life. (Linc. MSJ at 43–44; ECF No. 96-33, Ex. UU; ECF No. 96-34, Ex. VV; ECF No. 96-19, Ex. BB at *9–*10.) Mr. Majerovic himself contacted Retirement and Retirement's agent via phone and email numerous times informing them that he never received any money from the sale of the Policy and sent the agent the non-altered Trust Agreement; Retirement's agent sent this information and the non-altered

Agreement to Mr. Espinosa, pointing out the relevant provisions. (Linc. SOF ¶¶ 118–25; ECF No. 96-35, Ex. WW; ECF No. 96-36, Ex. YY; ECF No. 96-37, Ex. ZZ.) Accordingly, Lincoln argues that no rational juror could conclude that Retirement has proven its claim for a premium refund.

Retirement inexplicably fails to respond to Lincoln's argument as to its premium refund counterclaim. Lincoln is entitled to summary judgment on this counterclaim on that basis alone. *See Player v. Motiva Enterprises, LLC*, 240 F. App'x 513, 522 (3d Cir. 2007) (if the movant meets its initial burden on summary judgment, "the nonmoving party must, in their opposition to the motion, identify evidence of record that creates a genuine issue of material fact" and cannot later argue same on appeal if that evidence was not identified to the district court at the summary judgment stage (citations omitted)); *Seals v. City of Lancaster*, 553 F. Supp. 2d 427, 433 (E.D. Pa. 2008) (granting summary judgment for defendant on plaintiff's claims because "plaintiff's failure to mention these issues in her summary judgment response constitutes abandonment of those claims"); *Ankele v. Hambrick*, 286 F. Supp. 2d 485, 496 (E.D. Pa. 2003) (deeming plaintiff's claim waived for failing to respond to defendant's argument in its summary judgment motion); *Daughtry v. Family Dollar Stores, Inc.*, No. 09–5111, 2011 WL 601270, at *8 (D.N.J. Aug. 5, 2011) (granting summary judgment for movant on plaintiff's claim because nonmovant failed to respond to movant's argument and thus waived claim); *Skirpan v. Pinnacle Health Hosps.*, No. 07-1730, 2010 WL 3632536, at *6 (M.D. Pa. Apr. 21, 2010) ("Where a plaintiff has brought a cause of action which is challenged through [a] motion for summary judgment as legally insufficient, it is incumbent upon the plaintiff to affirmatively respond to the merits of a summary judgment motion [and] a [p]laintiff's failure to respond to arguments raised on summary judgment effectively constitutes an abandonment of these causes of action and essentially acts as a waiver of these issues.").

Notwithstanding, in an abundance of caution, the Court has attempted scour Retirement's Opposition to Lincoln's Motion for Summary Judgment, as well as its own Motion for Summary Judgment and Reply brief in search of arguments pertaining to its premium refund counterclaim. The only references the Court found that may be applicable to this counterclaim are a few scattered references in Retirement's Brief in Opposition to Lincoln's Motion for Summary Judgment. First, in the factual background section, Retirement alleges that Mr. Espinosa, as Retirement's court-appointed receiver, "owed no duty to the court that appointed him or to Lincoln" to investigate the Policies. (RV Opp. to Linc. MSJ at 7.) Retirement also alleges that Lincoln knew that the Policies had STOLI red flags and did not notify Mr. Espinosa of same. (*Id.*) Second, in the section on Retirement's breach of contract and bad faith counterclaims, Retirement contends that Lincoln did not provide Mr. Espinosa with the Group Policy, and thus Mr. Espinosa could not have "assess[ed] coverage without the entire insurance contract . . . ." (*Id.* at 19.)

First, the Court notes that Retirement cites no case law or other legal authority in support of these passing references. *See N.J. Bldg. Laborers Statewide Ben. Funds v. Perfect Concrete Funding*, No. 10–1540, 2010 WL 2292102, at *1 (D.N.J. June 2, 2010) ("Respondent's brief cites no law: no statutory law, no case law, no scholarly authority. An undeveloped argument in a brief is waived."); *Aiellos v. Zisa*, 09–3076, 2010 WL 421081, at *5 (D.N.J. Feb.2, 2010) ("A throwaway argument left undeveloped is waived."). Nor is the Court aware of any legal authority for the proposition that Retirement somehow did not have the requisite knowledge or need not have noticed STOLI red flags because its receiver allegedly did not have a legal duty to investigate same.

As to Retirement's argument that Lincoln, itself, was aware of the STOLI red flags, assuming arguendo its accuracy, the Court does not find it fatal to Lincoln's summary judgment

motion on the premium refund counterclaim. In *Sun Life*, the New Jersey Supreme Court suggested in dicta that the insurer's conduct is relevant: some of the cases that the Court cited approvingly considered the "*relative* culpability of the *parties*." *Id.* at 859 (emphasis added). However, *Sun Life* did not hold that a party is entitled to a refund of the premiums when it is unquestionably on notice that the policies were STOLI just because the opposing party was *also* on notice that the policies were STOLI.[16] Rather, it appears that courts typically issue premium refunds to parties who are more properly understood as wholly blameless. *See Sun Life Assurance Co.*, 779 F. App'x at 929 ("[A]s a later innocent purchaser of the Policy, [defendant] was not responsible for and did not have knowledge of the STOLI arrangement when it continued to make payments on the Policy."); *Sun Life Assurance Co.*, 263 F. Supp. at 704 (finding policy assignee entitled to a premium refund because it was "not to blame for the fraud here" but rather "merely acquired a life insurance policy . . . that turned out to be void.") Even if Lincoln was aware of the Policies' STOLI red flags, based on the undisputed record, the Court simply cannot find that Retirement was an innocent purchaser with no knowledge as to the STOLI arrangement—especially in light of the fact that Retirement had been shut down by the Texas government for fraud related to its life insurance policies and received communications from same as early as 2010 warning Retirement that many of their policies appeared to be STOLI. Accordingly, the Court finds that Retirement is not entitled to a refund, and Lincoln's Motion for Summary Judgment is **GRANTED** as to Retirement's counterclaim for recoupment of the premiums.

---

[16] The Court also finds instructive that the New Jersey Supreme Court rejected a similar argument that an insurer may "waive, or be estopped" from contesting the validity of a STOLI policy. *Sun Life*, 208 A.3d at 857; *see also Kunstlinger*, 2023 WL 4669424, at *3 (rejecting plaintiff's argument that defendant cannot challenge the STOLI policy because due to its awareness of an impermissible trust arrangement as "[d]efendant correctly states that New Jersey has rejected the argument that an insurer may waive, or be estopped to raise, the fraud.").

## <u>CONCLUSION</u>

For the reasons set forth above, Lincoln's Motion for Summary Judgment is **GRANTED**. Retirement's Motion for Summary Judgment is **DENIED**. An appropriate Order accompanies this Opinion.

_____

**ROBERT KIRSCH**
**UNITED STATES DISTRICT JUDGE**

<u>Dated</u>: August 19, 2024